Argued and submitted November 5, 1997, affirmed June 3, 1998

John WILLIAMS,
*Petitioner below,*

*and*

FRIENDS OF BARTON PARK AND
THE SCENIC CLACKAMAS RIVER,
*Petitioner,*

REDLAND/VIOLA/FISCHER'S MILL
COMMUNITY PLANNING ORGANIZATION,
*Intervenor,*

John TORGESON,
Sande Torgeson, Mike Barnett, Sue Barnett,
Sid Miles, Cindy Miles, Mark Hunt, Lisa Hunt
and Virginia Miller,
*Intervenors-below,*

*v.*

LAND CONSERVATION AND
DEVELOPMENT COMMISSION,
*Respondent,*

CLACKAMAS COUNTY,
Parker NW Paving Co., Estacada Rock Products, Inc.,
Oregon Concrete and Aggregate Producers Association,
and Gary Wilmes,
*Intervenors.*

(95-WKTASK-00533; CA A91480)

961 P2d 269

Annette E. Talbott argued the cause and filed the brief for petitioners.

John T. Bagg, Assistant Attorney General, argued the cause for respondent Land Conservation and Development Commission. With him on the brief were Hardy Myers, Attorney General, and Virginia L. Linder, Solicitor General.

Frank M. Parisi argued the cause and filed a brief for intervenors Parker NW Paving Co., Estacada Rock Products, Inc. and Oregon Concrete and Aggregate Producers Association.

Jacqueline A. Tommas filed a brief for intervenor Redland/Viola/Fischer's Mill Community Planning Organization.

Michael E. Judd, Chief Assistant County Counsel, filed a brief for intervenor Clackamas County.

Thomas J. Rastetter filed a brief for intervenor Gary Wilmes.

Before Riggs, Presiding Judge, and Landau and Wollheim,* Judges.

RIGGS, P. J.

---

* Wollheim, J., *vice* Leeson, J.

### RIGGS, P. J.

This land use case involves challenges to a Land Conservation and Development Commission (LCDC) order issued following periodic review of Clackamas County's acknowledged comprehensive plan. *See* ORS 197.628 *et seq.* In its order, LCDC approved the county's updated Goal 5[1] plan for mineral and aggregate resources, subject to the county's adoption of certain revisions proposed by the Department of Land Conservation and Development (DLCD). Petitioner and intervenor[2] challenge the order, arguing that the county's plan is inadequate in several respects and that the process that produced it was flawed. Petitioner further argues that LCDC lacked authority to require the county to adopt DLCD's recommended changes to the updated plan. We affirm.

The county began work to update its mineral and aggregate resources program in 1990, as part of a periodic review of its acknowledged comprehensive plan. In 1994, the county submitted to DLCD a proposed "work program" under ORS 197.633(3)(e) and the revised periodic review rules. OAR 660, Division 25. Those provisions require local governments such as Clackamas County to submit to DLCD a work program that establishes the scope of matters to be considered during periodic review, which work program is composed of "work tasks" for the government to complete. ORS 197.633(3)(e); OAR 660-025-0090. DLCD approved the county's work program in 1994. Work Task 5 of that program requires the county to adopt a revised inventory and Goal 5 analysis for mineral and aggregate resources.

---

[1] Goal 5 (Open Spaces, Scenic and Historic Areas, and Natural Resources) was promulgated "[t]o conserve open space and protect natural and scenic resources." The goal and the related administrative rules contain procedural and planning requirements, among them the requirement that natural resources, including mineral and aggregate resources, be inventoried and managed according to a comprehensive plan created by a local government and approved and periodically reviewed by LCDC.

[2] Four intervenors filed briefs in this judicial review, one challenging and three supporting LCDC's order. For sake of simplicity, we refer to the intervenor opposing the order, Redland/Viola/Fischer's Mill Community Planning Organization, as "intervenor" in the body of this opinion.

The county submitted its final decisions on Work Task 5 to DLCD in January 1995. In September of that year, DLCD issued its report on the county's work task under OAR 660-025-0160. That report stated that, although "the information in the submittal [was] sufficient" to support the county's identification of significant aggregate and mineral sites, the work task nevertheless did not comply with Goal 5. The county filed an exception to the report, as did several other interested parties. DLCD responded to the county's exception by letter, suggesting that its objections to the work task could be resolved through discussion and stating that DLCD would develop specific program changes based on those discussions that would bring the work task proposal into compliance with Goal 5.

Those specific changes were incorporated into DLCD's final report on the county's Work Task 5 submission, which DLCD issued in November 1995. In its report, DLCD recommended that LCDC direct the county to amend its mineral and aggregate program to reflect the changes in the DLCD report. LCDC agreed and issued an order approving the county's program, contingent on the county's adoption of the revisions proposed by DLCD. That order is the subject of this petition.

Petitioner and intervenor challenge LCDC's order on a number of grounds. Several of their arguments track each other closely, and we will analyze them together where appropriate. We will set aside an order on periodic review only if we find, based on the evidence in the record, that the order erroneously interprets a provision of law, is unsupported by substantial evidence or embodies an improper exercise of agency discretion. ORS 197.650(1); ORS 183.482.

■ We first address petitioner's contention that LCDC lacked authority to direct the county to adopt DLCD's proposed revisions of the county's work task. Those revisions were directed at the county's explanation of its decisions on periodic review rather than at the decisions themselves; the LCDC order states that DLCD was responding to "deficiencies" in the work task, which "generally encompassed inadequate analysis or explanation of information in the locally-developed record." LCDC argues that it could direct the

county to adopt revisions to correct those analytical deficiencies under OAR 660-025-0160(6)(c). That rule provides:

"(6) Following its referral or appeal hearing, [*LCDC*] *shall issue an order which does one or more of the following:*

"(a) Approves the work task;

"(b) Remands the work task to the local government, including a date for resubmittal;

"(c) *Requires specific plan or land use regulation revisions to be completed by a specific date.* Where specific revisions are required, the order shall specify that no further review is necessary. These changes are final when adopted by the local government." (Emphasis supplied.)

Petitioner urges that DLCD's revisions are not the sort of "specific plan or land use regulation revisions" contemplated by OAR 660-025-0160(6)(c). It asserts that the rule gives LCDC authority only to order changes to a local government's comprehensive plan and land use regulations themselves. Here, petitioner argues, LCDC directed the county to change its periodic review work program and work task documents, rather than its actual comprehensive plan.

Petitioner's argument is unavailing. Even were we to accept its construction of OAR 660-025-0160(6)(c), LCDC's action still would be proper, because, for purposes of this analysis, DLCD's proposed revisions became part of the county's comprehensive plan when the county adopted them. *See Urquhart v. Lane Council of Governments,* 80 Or App 176, 179 n 2, 721 P2d 870 (1986) ("LCDC must necessarily approve the inventory in order to approve the plan as complying with Goal 5. Consequently, the Goal 5 inventory of a jurisdiction with an acknowledged plan is the equivalent of an acknowledged plan provision * * *."). LCDC's order directs the county to repeal parts of its inventory and to amend its plan by adopting DLCD's revisions. Accordingly, LCDC's order requires the county to make specific revisions to its comprehensive plan, and LCDC's action in requiring the revisions was proper even under petitioner's reading of the rule.

Petitioner further argues that requiring the changes was "outside the agency's discretion," because the Goal 5 rules require the county, and not DLCD, to perform the required analysis of its mineral and aggregate resources. To the extent that petitioner is arguing that LCDC cannot require a county to reword the report of its already completed mineral and aggregate analysis, petitioner is mistaken. If, on the other hand, petitioner is arguing that LCDC cannot cover up a local government's failure to comply with the substantive requirements of a goal and the related rules by making cosmetic changes to the government's periodic review documents, then its argument is unavailing on the facts of this case, because, as we discuss in more detail below, we reject petitioners many arguments that Clackamas County's periodic review process was flawed. Rather, we agree with LCDC's conclusion that the county substantively complied with the goal and the rules and fell short only in its written description of the analysis it had conducted. OAR 660-025-0160(6)(c) allows LCDC to correct such shortcomings by ordering a local government to adopt revisions of the sort DLCD proposed here, and we reject petitioner's arguments to the contrary.

Petitioner's and intervenor's remaining arguments concern the adequacy of the county's Goal 5 periodic review process, analysis and conclusions. We note at the outset that our review is of LCDC's order, not the county's work task. Where, as here, LCDC has concluded that a local government's actions comply with the goal and rules, we review the order to determine whether it reflects accurate interpretations of those provisions and, to the extent that it embodies *agency* factual findings, whether those findings are supported by substantial evidence. ORS 183.482(8). Some of petitioner's and intervenor's specific arguments, implicitly or explicitly, take issue with what they appear to view as the *county's* findings. In most if not all instances, however, the substance of the arguments is not concerned with whether there was evidence to support what the county found but with whether the nature and scope of the county's determinations satisfied the requirements of Goal 5 and LCDC's implementing rules. We review those arguments to determine if, as a matter of law, LCDC was correct in holding that

the goal and rules were satisfied. *Oregonians in Action v. LCDC*, 121 Or App 497, 504, 854 P2d 1010, *rev den* 318 Or 170 (1993). If the order satisfies the foregoing standards, nothing in the goal, rules or statutes allows us to substitute our judgment for that of the county or the agency with respect to particular matters such as the decision to include a particular aggregate site in a Goal 5 inventory.

Goal 5 and the related rules require a local government to conduct an inventory of resource sites in its area. Based on its analysis of "available data," the government determines which sites are significant and includes those sites in its inventory. OAR 660-016-0000(1). The government then identifies possible conflicting uses for inventoried resource sites and analyzes the economic, social, environmental and energy (ESEE) consequences of those conflicting uses. OAR 660-016-0005. Based on that analysis, the government must "develop a program to achieve the goal" by resolving conflicts between allowable uses on inventoried Goal 5 sites in one of three ways: By protecting the resource site fully and barring conflicting uses, by allowing the conflicting use fully, or by balancing the ESEE consequences of the conflicting use with the consequences of protecting the site and allowing the conflicting use to some limited extent. OAR 660-016-0010. Petitioner and intervenor raise assignments of error directed at every step in that process.

Concerning the county's inventory of significant mineral and aggregate sites, petitioner and intervenor argue that LCDC erred in approving an inventory that, they contend, was flawed in several respects. The relevant rules provide that a " 'valid' inventory of a Goal 5 resource * * * must include a determination of the location, quality, and quantity of each of the resource sites." OAR 660-016-0000(2). The determinations of quality and quantity "require[ ] some consideration of the resource site's relative value [or abundance], as compared to other examples of the same resource in at least the jurisdiction itself." OAR 660-016-0000(3). An inventory "will be adequate for Goal compliance unless it can be shown to be based on inaccurate data, or does not adequately address location, quality or quantity." OAR 660-016-0000(4).

In preparing its inventory, Clackamas County started with a list of 527 possible mineral and aggregate sites identified in a 1991 report of the Department of Geology and Mineral Industries (DOGAMI). The county then assembled information about quality, quantity and location of those sights from DOGAMI reports, county mineral lands permit files, mine operators and public comment, and hired a civil and geological engineering firm to assist with analysis of the information it collected. Based on that information, the county proposed four sites for immediate inclusion in its inventory and three sites for inclusion following completion of the Goal 5 analysis of the sites. The county placed 50 additional sites on a list of "potential sites" about which further information was needed before a determination of significance was possible.

Intervenor first argues that the inventory was inadequate because the county did not investigate enough aggregate and mineral sites to perform a proper comparative analysis. Neither the goal nor the related rules specify how many sites a local government must consider. Nevertheless, intervenor contends that the county's focus on the 527 sites from the DOGAMI report was improper and asserts that "[t]he purpose of the inventory of aggregate is to locate all of the aggregate sites in the county." We reject that contention. The rules governing inventories specify that the process involves the collection and analysis of "available data from as many sources as possible including experts in the field, local citizens and landowners." OAR 660-016-0000(1). That focus on "collecting * * * available data" from "sources" strongly suggests that the inventory process was intended to begin with the gathering, by a local government, of all *existing information* concerning the locations and characteristics of possible resource sites. That conclusion is reinforced by the next sentence of the rule, which provides:

> "The local government then analyzes and refines the data and *determines whether there is sufficient information on the location, quality and quantity of each resource site to properly complete the Goal 5 process.*" (Emphasis supplied.)

If there is *not* sufficient information, the remedy is not for the local government to go into the field and conduct further

independent investigation. Rather, the rules provide that the local government may delay the process for a site or group of sites, while completing the Goal 5 process for the sites for which sufficient information is available. OAR 660-016-0000(5)(b).

Nothing in the goal or the rules requires a local government to undertake the impossible task of identifying every undiscovered, untapped source of minerals in its area as part of the Goal 5 inventory process. The specific focus on "available data" in the Goal 5 rules makes clear that a local government's role at the beginning of the inventory process is to gather existing data about resource sites and to complete the Goal 5 process as to those sites for which sufficient information exists to allow the government to make a reasoned determination of significance. LCDC did not err in finding that the county had considered a sufficient number of sites to fulfill the requirements of the goal and the rules.

We also reject intervenor's argument, presented in its first assignment of error, that LCDC erred in approving an inventory which did not assure the "preservation and protection" of aggregate resources for future use. Central to that argument is intervenor's contention that Goal 5 imposes upon local governments the affirmative obligation to locate undiscovered deposits of aggregate and to protect those deposits from potential conflicting uses. As stated above, LCDC properly rejected intervenor's expansive view of local governments' investigatory duties under Goal 5. Intervenor identifies no other support for its argument, and LCDC did not err in the manner intervenor suggests.

Petitioner does not appear to find fault with the county's original focus on the 527 sites from the DOGAMI list. Rather, it argues that the county erred by concentrating primarily on the smaller subset of sites for which information was provided by owners and operators and states that LCDC should have required the county to seek information more aggressively about a larger number of sites. Had the county actively investigated more sites, petitioner asserts, it might have made a different decision regarding one site on its list of significant aggregate sites, River Island Sand and Gravel (RISG).

Petitioner suggests several specific reasons why LCDC erroneously interpreted the goal or rules by not requiring the county to undertake additional analysis of resource sites before making its significance determinations. First, petitioner challenges the county's decision to list 50 sites on its inventory as "potential sites" pursuant to OAR 660-016-0000(5)(b). That rule provides:

"(5)   Based on data collected, analyzed and refined by the local government, as outlined above, a jurisdiction has three basic options:

"* * * * *

"(b)   Delay Goal 5 Process: When some information is available, indicating the possible existence of a resource site, but that information is not adequate to identify with particularity the location, quality and quantity of the resource site, the local government should only include the site on the comprehensive plan inventory as a special category. The local government must express its intent relative to the resource site through a plan policy to address that resource site and proceed through the Goal 5 process in the future. The plan should include a time-frame for this review."

The order states that the county designated "potential" mineral and aggregate sites when it gathered insufficient information about quality, quantity or location to determine the significance of those sites. LCDC erred in accepting that designation, petitioner argues, because the county should not have been allowed to rest its analysis where it did but should have been required to more actively seek information about the 50 "potential" sites. The first difficulty with that argument is that OAR 660-016-0000(1) contemplates an inventory process based on analysis of "available data." While petitioner is undoubtedly correct that LCDC *could* have required the county to gather more information about potential sites, petitioner does not point to a provision of the goal or the rules that requires LCDC to do so.

Petitioner suggests that we should find such a requirement from the use of the word "obtainable" in OAR 660-016-0000(3), which, in discussing the analysis of quantity and quality of inventoried resource sites, states: "The

level of detail that is provided will depend on how much information is available or 'obtainable.' " Petitioner suggests that we import the word "obtainable" into OAR 660-016-0000(5)(b), and require the county immediately to determine the significance of any site for which sufficient information about location, quality or quantity is *obtainable*. The difficulty with that suggestion is that OAR 660-016-0000(5)(b) allows delays in the Goal 5 process when insufficient information is "available." The only instance in which the Goal 5 rules mention "obtainable" information is in describing the amount of information that should be provided regarding the quality and quantity of an inventoried resource site. Petitioner's attempt to create a general requirement that local governments gather all "obtainable" information during the inventory process is not well taken in view of the rules' repeated focus on "available" information.

Further, petitioner's proposed construction of the inventory requirements would effectively read OAR 660-016-0000(5)(b) out of existence. That rule provides for exactly the action that the county took in this case. "Some information" was available indicating the possible existence of aggregate resource sites, but that information was "not adequate to identify with particularity the location, quality and quantity of the resource site[s]," so the county placed "the site[s] on the comprehensive plan inventory as a special category." Petitioner suggests that in such cases the local government must seek out enough information about sites to make a significance determination. If that were required, however, it is difficult to imagine a circumstance under which OAR 660-016-0000(5)(b) would operate. When a local government lacked sufficient information to determine the significance of a potential site, the government would be required to obtain such information before its inventory was complete. That requirement would preempt OAR 660-016-0000(5)(b), which provides for delaying the inventory process, as the county did here, when complete information about a site is not available. We decline to read the Goal 5 inventory rules to produce such a result.

We also have considered petitioner's argument that the delay provisions of OAR 660-016-0000(5)(b) violate Goal

5. Petitioner presents no compelling support for that argument, and we reject it without discussion. We also reject petitioner's argument that the county did not comply with the terms of the rule when it designated potential sites. The county work task lists the sites for which the Goal 5 process is being delayed and the reason for the delay and states that the county will review the sites by 2005 if information exists at that time from which to judge significance. Petitioner does not explain in what respect that explanation falls short, except to say that the county does not specify how it will "obtain" information about the sites in the future. As previously stated, we reject petitioner's attempt to graft the word "obtain" onto OAR 660-016-0000(5)(b). The work task statements concerning potential sites comply with the facial requirements of the rule, and, accordingly, LCDC did not err in accepting those statements.

■     Next, petitioner challenges LCDC's decision to allow the county to postpone completion of the inventory process for three sites that it determined to be significant. The county explained that it received additional information about the sites while it was conducting its analysis and needed more time to complete the Goal 5 process for those sites. LCDC allowed the postponement and directed the county to complete its Goal 5 analysis of the three sites by December 31, 1998.

     Petitioner contends that decision was improper because LCDC cited no rule or statute allowing such a postponement. We disagree. The relevant rule is OAR 660-016-0000(5)(c), which provides, in part:

> "When information is available on location, quality and quantity, and the local government has determined a site to be significant or important as a result of the data collection and analysis process, the local government must include the site on its plan inventory and indicate the location, quality and quantity of the resource site * * *. Items included on this inventory must proceed through the remainder of the Goal 5 process."

Here, the county has completed the Goal 5 process for four significant sites and is proceeding through the process for the other three. When the county completes its analysis of those

three sites, LCDC's order requires the county to submit that analysis to the agency for review.

Contrary to petitioner's assertion, nothing in OAR 660-016-0000(5)(c) requires a county to complete the Goal 5 process for *all* sites it has determined to be significant as a precondition of LCDC review of those sites for which the inventory process has been completed. The rule simply states that the county must list significant sites on its inventory and that sites "included on this inventory must proceed through the remainder of the Goal 5 process." Here, those requirements have been or are being met, and LCDC's order mandates that the county complete its Goal 5 analysis of the three remaining sites in the near future. Petitioner gives no reason why that approach violates either the spirit or the letter of the goal or rules. LCDC did not erroneously interpret OAR 660-016-0000(5)(c) by allowing the county additional time to complete its analysis of the three sites about which it received additional information.

■ Petitioner and intervenor also challenge LCDC's approval of the county's determinations of quality and quantity for the inventoried resource sites. As previously noted, "[a] 'valid' inventory * * * must include a determination of the * * * quality and quantity of each of the resource sites." OAR 660-016-0000(2). That determination must include "some consideration" of the sites' "relative value, as compared to other examples of the same resource in at least the jurisdiction itself." OAR 660-016-0000(3). To survive a challenge, an inventory must "adequately address * * * quality and quantity." OAR 660-016-0000(4).

Petitioner and intervenor assert that the county's determination of quality was flawed because the county failed adequately to consider the "relative value" of the resource sites that it determined were significant. Specifically, they argue that LCDC erred in approving the county's method for testing the quality of aggregate at different sites. The county chose to measure aggregate quality by conducting three tests: weight loss through abrasion, weight loss through air degradation and sodium sulfate soundness. Those tests are used by the Oregon Department of Transportation (ODOT) to determine whether aggregate meets its

specifications for road construction. The county work task, incorporated by reference into LCDC's order, states that the county views "sites with test results showing the material meets those ODOT specifications as more valuable than sites without comparable information."

Neither petitioner nor intervenor proposes another test of aggregate quality or asserts that the county mischaracterized the results of the tests it conducted. They simply contend that LCDC erred in approving the county's quality determination because aggregate is used for purposes other than road construction and because the Goal 5 rules do not specify the use of ODOT tests for aggregate quality. That argument misses the point. The Goal 5 rules simply require local governments to consider the relative quality of the resource at a site. To do so, the government must necessarily identify some means of testing the quality of the resource. Here, the county relied on objective tests of the physical properties of aggregate and determined that aggregate that meets the specifications of a major consumer, ODOT, has greater relative value than aggregate that does not. We agree with LCDC that the county's testing easily met the requirement of "some consideration" of the "relative value" of the aggregate at the resource sites. Accordingly, we reject petitioner's and intervenor's challenge to the county's quality determination.

Concerning quantity, petitioner claims that LCDC erred in accepting the county's work task quantity determinations. In its initial work task submission, the county had determined that only aggregate sites containing more than one million cubic feet of available aggregate were significant. In so deciding, the county relied on statements in the record from mine and quarry operators who testified that one million cubic feet was the minimum volume required for a commercially viable mine. After reviewing the work task, DLCD proposed changing that analysis to remove the strict numerical standard for significance on which the county based its decision and suggested alternate wording to explain the county's quantity determinations. LCDC's order directs the county to adopt DLCD's revisions.

Petitioner argues that LCDC could not properly direct the county to adopt those revisions. We reject that

argument for the reasons stated above. Petitioner argues further that when LCDC directed the county to change its one million cubic foot standard, it should have required the county to conduct anew its quantity determination. Again, petitioner misconceives the nature of the requirements that the Goal 5 rules place on the county. The county is simply required to give "some consideration" to the relative abundance of aggregate at various sites. Here LCDC properly concluded that the county had done so. Whether or not the county originally believed that it could arrive at some absolute numerical standard for a significant aggregate site,[3] the fact remains that it accumulated extensive information about the amount of aggregate at various sites, analyzed that information together, and included the sites containing the largest amounts of aggregate in its inventory. We find no requirement of the goal or the rules with which the county failed to comply in making its quantity determination, and LCDC did not err in approving that determination.

Petitioner also assigns error to LCDC's approval of the county's determination of the "impact areas" of the inventoried aggregate sites. OAR 660-016-0000(2) provides, in part:

> "For site-specific resources, determination of *location* must include a description or map of the boundaries of the resource site and of the impact area to be affected, if different." (Emphasis in original.)

The term "impact area" is not defined. Petitioner makes several arguments in support of its contention that the impact areas in the county work plan are inadequate.

First, petitioner contends that the county improperly used a generic impact area for all of its inventoried sites. Petitioner points to the fact that the county, after noting that other counties had used impact areas of between 500 feet and one-half mile in their analysis of aggregate sites, concluded that conditions at the Clackamas County sites warranted relatively small impact areas. The county work task states that "an area within 750 feet of a significant resource site is a

---

[3] The issue of whether an absolute numerical standard for quantity would be proper for a determination of significance is not before us, and we do not address it.

reasonable area in which to analyze conflicting uses." It was error for LCDC to approve that standard, petitioner concludes, because Goal 5 and the rules require the county to determine individual impact areas for sites rather than using a single impact area for all sites.

Even assuming that argument would otherwise be meritorious, it is factually incorrect in this case. While it is clear from the record that the county *began* its analysis based upon a generic impact area of 750 feet, it is equally clear that the generic standard was only a starting point for the county's analysis. The county's work task states that the 750-foot impact area

> "is only for analytical purposes at this stage of the Goal 5 planning process. It also is not an absolute distance. The impact area associated with a resource site could be larger or smaller than this area depending on conditions specific to each site."

In fact, the actual impact areas in the county's work task do not reflect a uniform 750-foot standard, but are varied in individual cases in response to conditions at individual sites. We reject petitioner's request that we remand the order for the county to conduct site-specific impact area analysis, because it is clear on this record that the county already has done so.

Petitioner next objects to language in the county's work task that suggests that the county viewed the impact area as the area in which conflicting uses must be regulated to protect the resource site. Petitioner urges that we find that LCDC erred in accepting a work task that included that language, because an impact area also must serve "to protect existing conflicting uses from the impacts of developing a Goal 5 resource * * *." *Palmer v. Lane County*, 29 Or LUBA 436, 439 (1995).

The short answer to petitioner's objection is that the county *did* consider both the impacts of conflicting uses on the resource site and the impacts of the resource site on conflicting uses in making its decisions on impact area. That is clear from numerous statements in the county's work task. For example, the work task states:

"The impact area for an aggregate resource site is the area that includes conflicting uses and resources that could adversely affect the aggregate resource or its use, *and the area where uses and resources could be adversely effected [sic] by the aggregate resource or its use.*" (Emphasis supplied.)

Further, the record makes clear that the county spent substantial time and effort analyzing the effect of aggregate sites on nearby conflicting uses. Petitioner's argument to the contrary is not well taken.

Petitioner's final challenge to the county's impact areas is focused on the RISG site, which is located adjacent to the Clackamas River. Petitioner asserts that "the county failed to delineate the proper impact area by not including the entire river in the impact area even though the local record contains reports indicating there could be impacts to the river itself and its fishery resources." It is important to note that petitioner is not arguing merely that the stretch of the river adjacent to RISG should be included in the impact area; that is already the case, as the work task states that "the east bank of the Clackamas River is the eastern extent of the impact area." Rather, its argument is that LCDC must require the county to include the *entire length* of the Clackamas in the RISG impact area and, consequently, to address the ESEE consequences of RISG operations on the entire river.

We need not address the merits of that expansive reading of the Goal 5 impact area requirements. *But see Callison v. LCDC*, 145 Or App 277, 285-86 n 10, 929 P2d 1061 (1996), *rev den* 325 Or 403 (1997) (rejecting argument that the City of Portland was required to address Goal 19 (Ocean Resources) during periodic review because several streams within the city's planning area contained anadromous fish). Although petitioner is correct that the record contains testimony and reports warning of impacts to the river and its fish, the record also contains testimony and reports stating that no such impacts will occur. The county concluded based on that evidence that, so long as proper safeguards and permit conditions were maintained, the impact of RISG on the river and the fish resource would be negligible. Because we hold, as discussed below, that the county's conclusion on that point

was justified, petitioner's argument fails. LCDC properly concluded that the Goal 5 rules do not require a local government to draw its impact areas to account for impacts that it has concluded will not occur, provided that its conclusions are consistent with Goal 5 and supported by substantial evidence.

Next, we address petitioner's and intervenor's arguments that LCDC erred in accepting the county's conflicting use and ESEE analysis for the inventoried sites. First, petitioner argues that the county failed adequately to identify conflicting uses, particularly at the RISG site. However, petitioner fails to point to any specific conflicting use at the site that the county should have considered, with the exception of fishing. Among the conflicting uses that the county identified and analyzed at the RISG site were fish, water quality, riparian areas, hydrology, fish and wildlife management programs and river conditions. Under the circumstances, we cannot say that LCDC's failure to require the county to analyze "fishing" separately requires reversal.

We also reject intervenor's challenge to the county's conflicting use analysis. Intervenor asserts that LCDC erred in approving an analysis that "placed all the burdens for conflicts from the extraction of aggregate on the neighboring properties." We do not agree with intervenor that the record reveals an inequitable burdening of neighboring properties. Indeed, the work task includes a long list of restrictions on aggregate operations, aimed at reducing conflicts with neighboring uses. LCDC did not err in approving the county's conflicting use analysis.

■ Nor are we persuaded by intervenor's and petitioner's assertions that the county's ESEE analysis was inadequate. Intervenor argues that LCDC erred in failing to require the "[c]ounty's ESEE analysis to provide clear and objective standards to evaluate the conflicts and balance the impacts" between resource sites and conflicting uses. We reject that argument. Neither Goal 5 nor the rules require a local government to provide "clear and objective standards" by which it resolves ESEE conflicts. The rules simply require the government to present "reasons" in its comprehensive

plan that support its decisions about resource sites and conflicting uses. OAR 660-016-0010(1)-(3). The only requirement of clear and objective standards in the ESEE process comes from OAR 660-016-0000(3). That rule provides that when a local government limits activities on neighboring land to protect a resource site, the limitation "must be specific enough so that affected property owners are able to determine what uses and activities are allowed, not allowed, or allowed conditionally and under what clear and objective conditions or standards." The rule does not create a general requirement that local governments create "clear and objective standards" to govern ESEE conflicts, and LCDC did not err in failing to require the county to provide such standards.

Petitioner contends that evidence from the county's ESEE review indicated that extraction would have various adverse environmental impacts, relating primarily to water quality, fish and hydrology in the RISG area. The work task and the record indicate that the county considered the possibility of the impacts that petitioner describes. However, based upon other evidence in the record, the county decided that those impacts would not occur or would be negligible. For example, in discussing the potential effect of the RISG site on Clackamas River salmon, the work task declares:

> "Based on its review of the testimony, the county concludes that salmon spawning habitat next to or downstream from the aggregate site can be adequately protected during and after mining. The county finds that the resource site is not in the Clackamas River, and no mining will occur in the river itself. The county finds that because mining will not occur in the river and mining will be set back a large distance from the river, the potential for sediment or chemical contamination is remote and can be prevented."

Petitioner challenges that conclusion and other of the county's conclusions relating to environmental impacts, arguing that LCDC erred in finding that they were supported by substantial evidence and were reasonable in light of the evidence in the record.

The county's findings in its ESEE analysis embody both basic findings of fact (for example, the finding that mining at RISG will not occur in the river channel) and inferences drawn from those facts (for example, the inference that

salmon spawning habitat can be protected adequately). In such cases, our review for substantial evidence involves two related inquiries:

"(1) whether the basic fact or facts are supported by substantial evidence, and (2) whether there is a basis in reason connecting the inference to the facts from which it is derived." *City of Roseburg v. Roseburg City Firefighters*, 292 Or 266, 271, 639 P2d 90 (1981).

Here, petitioner's arguments are directed primarily to the second step in that inquiry. To the extent that petitioner argues that certain of the county's basic factual findings are unsupported by substantial evidence, we disagree. "Substantial evidence exists to support a finding of fact when the record, viewed as a whole, would permit a reasonable person to make that finding." ORS 183.482(8)(c). The county's predicate factual findings satisfy that standard, as LCDC properly concluded.

We also agree with LCDC that the inferences that the county drew from those predicate facts were reasonable. Petitioner's argument to the contrary is primarily a recitation of evidence in the record that contradicts the county's conclusions. Our inquiry is whether the record, viewed as a whole, demonstrates a reasoned connection between the findings of fact and the inferences that the county drew. The fact that the evidence also might support another, contrary inference is of no moment, for

"[r]ational bases may exist for more than one inference to be drawn from the same primary fact, and the factfinder * * * has the task to decide which one to draw. The court does not substitute its judgment as to which inference should be drawn, but it must review for the existence of a rationale." *City of Roseburg*, 292 Or at 271.

Here, LCDC found that the record contained sufficient evidentiary support for the county's conclusions and that the county's work task, embodied in LCDC's order, sufficiently explains those conclusions. We cannot hold on this record that LCDC improperly applied the substantial evidence standard or otherwise erred in so finding. Accordingly, petitioner's arguments to the contrary are unavailing.

■     We also have considered and rejected petitioner's argument that the county failed to provide reasons in its comprehensive plan to support its ESEE and conflicting use decisions concerning the RISG site. We also reject petitioner's contention that LCDC improperly allowed the county to consider mitigation and permit conditions in its ESEE analysis. The basis of that contention is the fact that the county took into account conditions placed on RISG operations in determining what impacts those operations would have on the surrounding area. For example, the county took into account the fact that the site's operator is required to maintain a "dense forested buffer" around the site, which blocks the site from view from the river and nearby dwellings, in determining that the visual impact of the site would be minimal.

Petitioner claims that it was improper for the county to consider such mitigation measures and conditions on use in its determination of ESEE consequences. We disagree. The county was entitled to look at all conditions at the site in making its determination of ESEE consequences. If the county concluded that potential impacts were reduced or eliminated by conditions on the use of the site, it was proper to take that into account, provided the conclusion was reasonable. LCDC did not err in approving the ESEE analysis on that basis.

We have considered and reject without discussion petitioner's and intervenor's other challenges to LCDC's order approving the Clackamas County Goal 5 periodic review of mineral and aggregate resources, including intervenor's assignment of error asserting that the county's procedures violated Goal 1. We conclude that LCDC properly approved the county's mineral and aggregate review.

Affirmed.