Argued and submitted January 3, affirmed April 3, 2003

BEAVER STATE SAND AND GRAVEL, INC.,
*Petitioner,*

*v.*

DOUGLAS COUNTY;
Robert M. Wright; William M. Austin; Dorothy Austin,
*Respondents,*

*and*

DEPARTMENT OF LAND CONSERVATION
AND DEVELOPMENT,
*Intervenor.*

2002-065; A119715

65 P3d 1123

Timothy S. "Todd" Sadlo argued the cause for petitioner. With him on the brief were Frank M. Parisi, Stephen

Mountainspring, Dole, Coalwell, Clark, Mountainspring, Mornarich & Aitken, P. C., and Parisi & Parisi P. C.

Corinne C. Sherton argued the cause for respondents Robert M. Wright, William M. Austin, and Dorothy Austin. With her on the brief was Johnson & Sherton, P. C.

Hardy Myers, Attorney General, Mary H. Williams, Solicitor General, and Jas. Jeffrey Adams, Richard M. Whitman and Steven E. Shipsey, Assistant Attorneys General, filed the brief for intervenor Department of Land Conservation and Development.

No appearance for respondent Douglas County.

Before Edmonds, Presiding Judge, and Kistler and Schuman, Judges.

KISTLER, J.

## KISTLER, J.

Beaver State Sand and Gravel petitions for review of a LUBA decision holding that ORS 215.298 does not apply to a nonsignificant aggregate site. We affirm.

Beaver State owns an 80.10-acre parcel of land in Douglas County. The parcel is zoned Exclusive Farm Use (EFU)-Cropland and is located within the 100-year flood plain of the South Umpqua River. Beaver State identified a 35-acre section of the parcel that it wants to use to mine aggregate. As part of a larger attempt to get approval to mine the site, Beaver State submitted an application to Douglas County in October 1999, asking the county to amend its comprehensive land use plan to add the site to the county's Goal 5 inventory. In February 2002, the board of county commissioners held a hearing on the issue. At the hearing, Robert Wright, William Austin, and Dorothy Austin (intervenors) submitted testimony and argued that the property should not be added to the county's inventory. The county denied Beaver State's application, partially out of concern for the effect that mining the aggregate could have on surrounding land and also for the disturbance that the increased truck traffic would create.

Beaver State appealed the county's decision to LUBA. On appeal, LUBA began by explaining the statutory and regulatory scheme for obtaining a permit to mine aggregate. Specifically, it noted that ORS 215.298 provides that, in certain EFU zones, a "permit for mining of aggregate shall be issued only for a site included on an inventory in an acknowledged comprehensive plan." LUBA then explained that, when ORS 215.298 was enacted, the then-existing Goal 5 rule established a process for identifying and listing Goal 5 resources on a comprehensive plan inventory. *See* OAR 660-016-0000.[1] That rule directed the local government to collect data from as many sources as possible on the location, quality, and quantity of resource sites within the jurisdiction. OAR 660-016-0000(1), (2). Based on that information, a local

---

[1] In 1996, seven years after ORS 215.298 was enacted, a new Goal 5 rule was promulgated, which partially supersedes the old rule. *See* OAR 660-023-0000 - 660-023-0250.

government had three options: (a) do not include the resource on the inventory because it is a nonsignificant resource; (b) delay the Goal 5 process until more information is available; or (c) include the resource on the plan inventory as a significant resource. OAR 660-016-0000(5)(a) - (c). Under the Goal 5 rule as first promulgated, those options were known respectively as "1A," "1B," and "1C" options.[2]

Having explained the statutory and regulatory framework, LUBA made two rulings that are not challenged on review but that provide background for the issues that are raised on review. First, LUBA upheld the county's determination that the 35-acre parcel on Beaver State's land was a nonsignificant aggregate resource.[3] Second, as noted, the county decided not to include that parcel on its list of nonsignificant aggregate resources because of possible effects that mining might have on neighboring land.[4] LUBA ruled that, because the county based its decision on criteria that it may not have been authorized to consider, it was necessary to remand the case so that the county could identify its authority for considering those criteria.

LUBA then turned to intervenors' second cross-assignment of error. In that cross-assignment of error, intervenors argued that, even if the county amended its plan and added Beaver State's site to its list of nonsignificant aggregate sites, the site still would not be eligible for a conditional use mining permit under ORS 215.298. Beaver State responded initially that intervenors' argument was premature because it had only applied to have the site added to the county's list. On that issue, LUBA reasoned:

---

[2] OAR 660-016-0000 was promulgated in 1981. The regulation was amended in 1990, but none of the changes made by the amendment affects our analysis.

[3] This portion of LUBA's decision involved the new Goal 5 rule. *See* n 1 above. Under OAR 660-023-0180(3)(d)(B), an aggregate site in Douglas County cannot be "significant" if 35 percent or more of the proposed mining area has Class II soils, or a combination of Class II, Class I, or Unique soil on NRCS maps.

[4] The county's comprehensive plan contains an inventory of nonsignificant aggregate resources. Beaver State contends, and the county appears to have assumed below, that Beaver State could apply for a conditional use permit to mine the aggregate if the county would amend its comprehensive plan and add Beaver State's site to its list of nonsignificant sites.

"We disagree with [Beaver State's] initial argument, that the issue of whether the county can approve a conditional use permit to allow mining the subject property, once it is added to the county's list of non-significant sites, is premature. As noted, the premise of [Beaver State's] application, and the county's proceedings on that application, was that the legal effect of adding the subject property to the county's list of non-significant aggregate sites is that [Beaver State] may then seek approval to mine the site, pursuant to the statute. The county's decision denies the application, based on the perceived impacts of mining the subject property under the statute. Under these circumstances, it is inaccurate to characterize [Beaver State's] application as simply one to add the subject site to the county's '1A' list."

Beaver State argued alternatively that, even if the issue were properly before LUBA, intervenors' interpretation of ORS 215.298 was incorrect. On that issue, LUBA reasoned that, when the legislature enacted ORS 215.298 and authorized aggregate mining permits "only for a site included on an inventory in an acknowledged comprehensive plan," the relevant rules provided that nonsignificant or "1A" sites should not be included on an inventory. LUBA accordingly concluded that ORS 215.298 did not authorize local governments to issue mining permits for nonsignificant aggregate sites. Under the rules in place when the legislature enacted ORS 215.298, those sites would not have been "included on an inventory" within the meaning of ORS 215.298.

Beaver State has petitioned for review of LUBA's decision, and the Department of Land Conservation and Development (DLCD) has intervened in support of Beaver State. On review, both Beaver State and DLCD limit their arguments to LUBA's resolution of intervenors' second cross-assignment of error. Beaver State argues initially that LUBA's interpretation of ORS 215.298(2) was an improper advisory opinion. Beaver State and DLCD argue next that, if the meaning of that statute were properly before LUBA, LUBA erred in concluding that the phrase "included on an inventory" is limited to an inventory of significant aggregate sites. Intervenors respond that the statutory interpretation issue was properly before LUBA because ORS 215.298, properly interpreted, could affect the county's decision on remand.

On the merits, intervenors argue that LUBA correctly looked to the Goal 5 rules in place when the legislature enacted ORS 215.298 to determine that the phrase "included on an inventory" was not intended to refer to nonsignificant Goal 5 sites.

■ We begin with Beaver State's argument that LUBA's interpretation of ORS 215.298(2) was an "advisory opinion." As the term "advisory opinion" is ordinarily used, it refers to constitutional limitations on the judiciary's authority, *see Brown v. Oregon State Bar*, 293 Or 446, 449, 648 P2d 1289 (1982), and does not extend to bodies, such as agencies, that are not subject to the same limitations. Perhaps recognizing that problem, Beaver State bases its "advisory opinion" argument on ORS 197.835, which states that LUBA shall review land use decisions.[5] In this case, Beaver State argues that the county decided only that Beaver State's land should not be added to the county's "1A" list. The county did not go beyond that decision and decide, as LUBA did, whether a site added to a county's "1A" resource list is eligible for a conditional use permit. Unless and until the county makes that decision, Beaver State argues, LUBA's decision that such a listing is not eligible for a conditional use permit is merely advisory.

The text of ORS 197.835 does not explicitly limit LUBA's authority in the way that Beaver State perceives. But even if the text implicitly imposed that limitation, the issue that LUBA resolved is relevant to the county's proceedings on remand. In deciding whether to place the site on its "1A" list, the county appears to have understood that it was required to analyze the listing as if a conditional use mining permit might be issued at some time in the future. If LUBA's interpretation of ORS 215.298(2) is correct, the issue before the county on remand changes from a decision that requires consideration of additional land use goals because the site would be eligible for a conditional use permit to one that, from a land use permit perspective, has no legal significance. Because the resolution of that issue is necessary in order to

---

[5] ORS 197.835 provides, in relevant part: "The Land Use Board of Appeals shall review the land use decision or limited land use decision and prepare a final order affirming, reversing or remanding the land use decision or limited land use decision."

properly define the criteria the county may consider in making its decision on remand, the interpretation of ORS 215.298(2) was properly before LUBA. *See Johnson v. City of La Grande*, 167 Or App 35, 45, 1 P3d 1036 (2000) (recognizing that a court may provide guidance for local government on remand from LUBA); *Collins v. Klamath County*, 148 Or App 515, 518, 941 P2d 559 (1997) (same). We accordingly turn to LUBA's interpretation of ORS 215.298.

We review LUBA's interpretation of ORS 215.298 for errors of law, *Kelley v. Clackamas County*, 158 Or App 159, 165, 973 P2d 916 (1999), and begin by examining that statute's text and context, *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610-11, 859 P2d 1143 (1993). ORS 215.298(1) identifies when a land use permit is necessary to mine aggregate on EFU land. ORS 215.298(2), the subsection at issue in this case, establishes which aggregate sites are eligible for mining permits. It provides that "[a] permit for mining of aggregate shall be issued only for a site included on an inventory in an acknowledged comprehensive plan." The text of ORS 215.298(2) makes clear that, in order for Beaver State to get a permit to mine aggregate on a site, the site must be "included on an inventory in an acknowledged comprehensive plan." The text, however, leaves open the question what the phrase "included on an inventory" was intended to encompass. The statute's context answers that question. *PGE*, 317 Or at 611 (at the first level, a court examines both text and context).

The Supreme Court has recognized that the Land Conservation and Development Commission's (LCDC) rules provide context for the land use statutes. *Lane County v. LCDC*, 325 Or 569, 578, 942 P2d 278 (1997) (explaining that LCDC's regulations were context for ORS 215.304). In this case, LCDC promulgated OAR 660-016-0000 eight years before the legislature enacted ORS 215.298.[6] That rule implements Goal 5 and specifies which Goal 5 sites should and should not be included on a local government's inventory. It directs local governments to gather data to determine "the

___

[6] LCDC promulgated OAR 660-016-0000 in 1981. The legislature enacted ORS 215.298 in 1989. Or Laws 1989, ch 861, § 7.

location, quality, and quantity of each resource site." OAR 660-016-0000(2). It then provides:

"Based on data collected, analyzed and refined by the local government, as outlined [in OAR 660-016-0000(1)-(4)], a jurisdiction has three basic options:

"(a) **Do Not Include on Inventory**: Based on information that is available on location, quality and quantity, the local government might determine that a particular resource site is not important enough to warrant inclusion on the plan inventory, or is not required to be included in the inventory based on specific Goal standards. No further action need be taken with regard to these sites. The local government is not required to justify in its comprehensive plan a decision not to include a particular site in the plan inventory unless challenged by [DLCD], objectors, or [LCDC] based upon contradictory information;

"(b) **Delay Goal 5 Process**: When some information is available, indicating the possible existence of a resource site, but that information is not adequate to identify with particularity the location, quality and quantity of the resource site, the local government should only include the site on the comprehensive plan inventory as a special category. The local government must express its intent relative to the resource site through a plan policy to address that resource site and proceed through the Goal 5 process in the future. The plan should include a time frame for this review. Special implementing measures are not appropriate or required for Goal 5 compliance purposes until adequate information is available to enable further review and adoption of such measures. The statement in the plan commits the local government to address the resource site through the Goal 5 process in the post-acknowledgment period. Such future actions could require a plan amendment;

"(c) **Include on Plan Inventory**: When information is available on location, quality and quantity, and the local government has determined a site to be significant or important as a result of the data collection and analysis process, the local government must include the site on its plan inventory and indicate the location, quality and quantity of the resource site * * *. Items included on this inventory must proceed through the remainder of the Goal 5 process."

OAR 660-016-0000(5) (boldface added).

■ When the legislature enacted ORS 215.298, OAR 660-016-0000(5) specified which sites should and should not be included on a "plan inventory," *i.e.*, on the inventory that will be included in a local government's comprehensive plan. More particularly, subsection (5)(a) told local governments, "Do [n]ot [i]nclude" nonsignificant sites in a comprehensive plan inventory. *Cf. Williams v. LCDC*, 154 Or App 195, 202, 961 P2d 269 (1998) (explaining that, under OAR 660-016-0000, a local government "determines which sites are significant and includes those sites in its inventory"). It follows that, when the legislature provided in ORS 215.298 that permits for mining aggregate "shall be issued *only* for a site included on an inventory in an acknowledged comprehensive plan," it understood that nonsignificant aggregate sites would not be "included on an inventory" in a local government's comprehensive plan and thus would not be eligible for a mining permit. (Emphasis added.) We accordingly agree with LUBA that ORS 215.298(2), read in the context of OAR 660-016-0000(5), precludes issuing a mining permit for a nonsignificant aggregate site.

Beaver State and DLCD advance a number of arguments in support of a different conclusion. First, they argue that LUBA has inserted what the legislature omitted. They note that the statute authorizes a mining permit "only for a site included on an inventory in an acknowledged comprehensive plan." They argue that LUBA's interpretation impermissibly adds the phrase "of significant Goal 5 resources" after the word "inventory." That argument fails to recognize that, standing alone, the text of ORS 215.298(2) is ambiguous. ORS 215.298(2) authorizes permits for sites that are "included on an inventory in an acknowledged comprehensive plan," but it does not specify which sites should and should not be included on that inventory. OAR 660-016-0000(5) resolves that question. LUBA did not insert what the legislature omitted; rather, it properly looked to context to resolve a textual ambiguity.

Second, Beaver State argues that we should not assume that the legislature was aware of LCDC's rule when it enacted ORS 215.298. The legislature, however, delegated

authority to LCDC to adopt rules necessary to implement the broad land use policies established by the legislature. *Lane County*, 325 Or at 581-82. Given LCDC's integral role in the land use process, the Supreme Court has recognized that LCDC's rules serve as context for later legislative enactments. *Id.* at 578 (explaining that the context of ORS 215.304 included LCDC's regulations).

Third, Beaver State and DLCD argue that LUBA has misinterpreted OAR 660-016-0000(5). Beaver State reasons: "Clearly the rule does not prevent local governments from including [nonsignificant sites] in a comprehensive plan inventory—Douglas County has such an inventory, labeled 'Douglas County Mineral Resources Inventory,' that lists sites 'not important enough' to receive protection under Goal 5." DLCD makes a similar argument. Beaver State and DLCD's third argument appears to be based on two separate propositions. The initial proposition is that the legislature would have understood from the text of OAR 660-016-0000(5) that an inventory in a comprehensive plan can include nonsignificant sites. The text of the rule, however, says precisely the opposite. It tells local governments, "Do not include" nonsignificant sites in a plan inventory. *See* OAR 660-016-0000(5)(a). Neither Beaver State nor DLCD identifies anything in the rule that reasonably would have put the legislature on notice of the rule interpretation that they advance.

The alternative proposition underlying Beaver State and DLCD's third argument appears to be that, despite what the rule says, nonsignificant sites have in practice been included on some inventories in acknowledged comprehensive plans. The question before us, however, is what the legislature intended when it enacted ORS 215.298(2). In the absence of some legislative history showing that the legislature was aware of the practice (whatever it may have been), that practice has no bearing on the legislature's intent. Neither Beaver State nor DLCD identifies any legislative history that would support their position.

Fourth, Beaver State argues:

"LUBA's interpretation that ORS 215.298(2), 'allows mining in EFU zones only if the site is included on a

county's Goal 5 mineral resources inventory,' and that 'the "final plan inventory" was intended for significant sites,' conflicts logically and textually with its admission in footnote 21 * * * that the word ' "inventory" in ORS 215.298(2) includes the "special category" of "1B" sites in the county's inventory.' "

That argument misses the mark in two respects. The question that Beaver State notes involves "1B" sites—sites that, for lack of information, a local government cannot classify as either nonsignificant or significant when it compiles its inventory. Whether "1B" sites, as well as "1C" sites, are "included on an inventory" within the meaning of ORS 215.298 is irrelevant to whether "1A" sites, the issue presented here, also come within that phrase. Whatever tension exists regarding "1B" sites, it does not advance Beaver State's position.

Moreover, the terms of OAR 660-016-0000(5)(b) resolve any tension. That subsection provides that, when there is insufficient information "to identify with particularity the location, quality and quantity of the resource site, the local government should only include the site on the comprehensive plan inventory as a special category." OAR 660-016-0000(5)(b). That subsection also provides that, in the postacknowledgment period, the local government will address the "1B" site and proceed through the Goal 5 process. Put another way, the rule contemplates that, within a specified time, the local government will acquire sufficient information to determine whether the "1B" site should be downgraded to a "1A" or nonsignificant site or upgraded to a "1C" or significant site and listed as a protected resource on the inventory. There is nothing inconsistent in LUBA's recognition that "the 'final plan inventory' was intended for significant sites" and the fact that the rule provides that both "1B" and "1C" sites should be included on an inventory. If local governments follow the process set out in OAR 660-016-0000(5)(b), only significant sites will be included on the *final* plan inventory. *See* OAR 660-016-0000(1); *Williams*, 154 Or App at 202 (explaining that the local "government determines which sites are significant and includes those sites in its inventory").

Finally, Beaver State argues that LUBA's interpretation of the term "inventory" nullifies ORS 215.298(2), ORS

215.213(2)(d)(B), and ORS 215.283(2)(b)(B). It reasons that, under LUBA's interpretation, only "significant" sites may be placed on a plan inventory, and those sites, once placed on a plan inventory, do not need a conditional use permit in order to be mined. This means that the whole permitting scheme established by these statutes is no longer necessary. We reach a different conclusion. ORS 215.283(2)[7] provides, in part:

> "The following nonfarm uses may be established, subject to approval of the governing body or its designee in any area zoned for exclusive farm use subject to ORS 215.296:
>
> "* * * * *
>
> "(b)   Operations conducted for:
>
> "* * * * *
>
> "(B)   Mining, crushing or stockpiling of aggregate and other mineral and other subsurface resources *subject to ORS 215.298*[.]"[8]

(Emphasis added.) ORS 215.298(1) provides, in part:

> "For the purposes of ORS 215.213(2) and 215.283(2), a land use permit is required for mining more than 1,000 cubic yards of material or excavation preparatory to mining of a surface area of more than one acre."

Taken together, those statutes create a legislative land use policy that requires a permit in order to mine aggregate on EFU land, if the mining operation is over an acre or will mine more than 1,000 cubic yards of material. Under this statutory scheme, a site that meets the requirements of the regulation is deemed a "significant" aggregate resource and is placed on a local government's plan inventory. If that "significant" site exceeds the size and quantity limitations in the statute, a permit is needed before mining operations may take place. As a result, LUBA's interpretation does not nullify ORS 215.298(2), ORS 215.283(2)(b)(B), or ORS 215.213(2)(d)(B); it

---

[7] The site at issue in this case is subject to ORS 215.283.

[8] ORS 215.213(2)(d)(B) contains similar language.

merely identifies the type of sites, those determined "significant" and placed on a local government's acknowledged comprehensive plan inventory, that are eligible for a permit to mine aggregate on land zoned EFU.

In sum, we hold that the interpretation of ORS 215.298(2) was properly before LUBA in this case. We also hold that LUBA's interpretation of the statute is consistent with the text and context of the statute. LUBA did not err in determining that nonsignificant aggregate sites are not eligible for a conditional use permit under ORS 215.298(2).

Affirmed.