Argued and submitted February 22, affirmed on petitions and on cross-petition
July 7, reconsideration denied September 15, petition for review denied
December 7, 1993 (318 Or 170)

# OREGONIANS IN ACTION,
*Petitioner,*

*and*

# YAMHILL COUNTY,
*Petitioner - Cross-Respondent,*

*v.*

# LAND CONSERVATION AND
# DEVELOPMENT COMMISSION,
*Respondent - Cross-Respondent,*

*and*

# 1000 FRIENDS OF OREGON
and Mark Huff,
*Respondents - Cross-Petitioners.*

(91-RA-809; CA A73503 (Control), A73666)
(Cases Consolidated)

854 P2d 1010

David B. Smith, Tigard, argued the cause and filed the brief for petitioner.

John C. Pinkstaff, Assistant Yamhill County Counsel, McMinnville, argued the cause and filed the briefs for petitioner - cross-respondent.

John T. Bagg, Assistant Attorney General, Salem, argued the cause for respondent - cross-respondent. With him on the brief were Charles S. Crookham, Attorney General, and Virginia L. Linder, Solicitor General, Salem.

F. Blair Batson, Portland, argued the cause and filed the briefs for respondents - cross-petitioners.

Before Deits, Presiding Judge, and Riggs and Durham, Judges.

DEITS, P. J.

## DEITS, P. J.

1000 Friends of Oregon and Mark Huff (collectively "1000 Friends"), Yamhill County and Oregonians in Action (OIA) seek review of LCDC's periodic review order, which required the county to amend its comprehensive plan and land use regulations. We affirm.

The specific requirements of the LCDC order, and of the report of the Director of the Department of Land Conservation and Development (DLCD) that LCDC's order incorporates, included, *inter alia*: (1) that the county adopt an 80-acre minimum lot size for new farm parcels in addition to the 40-acre and 20-acre sizes contained in the legislation which the county had submitted for review, and that the county apply the respective minimum lot sizes in accordance with a map of the county's "agricultural subareas" prepared by DLCD; (2) that the county change the farm dwelling approval standards in its legislation to reflect larger lot size and income-producing requirements and to comply with LCDC rules, implementing Goal 3, that articulate criteria for permitting farm dwellings; (3) that the county adopt an interim mixed agriculture/forest plan designation and zone, subject to specific requirements stated in the order and the report; and (4) that it enact plan and regulatory provisions governing plan and zoning amendments that affect minimum lot size requirements for farms.

LCDC's review was governed by *former* ORS 197.640 to *former* ORS 197.647. Under ORS 197.647(4)(b), LCDC had authority to require

> "the local government to amend its acknowledged comprehensive plan and land use regulations to adequately respond to the standards of ORS 197.640(3)."

ORS 197.640(3) set forth standards that local governments had to apply in the periodic review process to assure the compliance of their land use legislation with the statewide planning goals and LCDC's rules implementing the goals.

The county assigns error to virtually all of the adverse requirements in LCDC's order. However, before turning to its specific contentions, we will address a theme that recurs in each of its assignments. The county argues that LCDC exceeded its authority by directing the county to take

particular planning actions or to enact particular provisions as part of its plan and regulations. In the county's view, LCDC's authority is confined to reviewing what the county did and, if it finds that the county's plan or regulations do not comply with the goals and rules, LCDC's only option is to remand for further independent efforts by the county. The county asserts that LCDC has no authority to "micromanage" the county or to require it to adopt specific legislative provisions or planning measures.

The county made essentially the same argument in *Yamhill County v. LCDC*, 115 Or App 468, 839 P2d 238 (1992), in challenging LCDC's requirement that it include particular resources in its Goal 5 inventory. We rejected that argument and explained that the language of *former* ORS 197.647(4)(b) and of the Goal 5 implementing rule

> "is somewhat ambiguous but, in the context of the periodic review statutes and process, the objectives are not. The county states that to 'construe *former* ORS 197.647(4)(b)' differently than it does 'would be to transform local land use planning under statewide land use goals, which is the very essence of ORS chapter 197, into statewide land use planning.' The county's understanding of the 'essence' of ORS chapter 197, at least as it relates to local compliance with the statewide goals as initially determined or as periodically redetermined, is 180 degrees removed from what the legislature intended. ORS chapter 197 is replete with provisions that emphasize that it is LCDC's and the Department of Land Conservation and Development's responsibility to promulgate and implement statewide land use planning goals and to assure that local governments adopt legislation that complies with them. *See, e.g.,* ORS 197.005(4); ORS 197.040(2)(d); ORS 197.175(1) and (2)(a); ORS 197.250; ORS 197.251; ORS 197.320 *et seq*; *former* ORS 197.640(1); ORS 197.646. Moreover, ORS 197.013 provides that, even after acknowledgment, '[i]mplementation and enforcement of acknowledged comprehensive plans and land use regulations are matters of statewide concern.'

> "Unlike the land use decision-making process, where local governments apply their acknowledged legislation, subject to LUBA's review for compliance with that legislation rather than the statewide goals, the acknowledgment and periodic review processes exist to test the sufficiency of local legislation and its compliance with the goals. The county's arguments appear to confuse the two contexts and to treat

LCDC's task here as the equivalent of LUBA's in an appeal from a local land use decision.

"That confusion is illustrated to some extent by the authority on which the county relies. For example, it cites *Urquhart v. Lane Council of Governments*, 80 Or App 176, 721 P2d 870 (1986), for the proposition that a 'city need not consider uninventoried Goal 5 resources in making a post-acknowledgment' land use decision. That is a correct summary of the holding in *Urquhart*; however, *Urquhart* involved LUBA review of a land use decision that affected an uninventoried resource, which LUBA could not require to be added to the inventory in conjunction with the specific land use decision before it. Far more salient here than the proposition for which the county cites *Urquhart* is our statement that 'ORS 197.640 to 197.647 make LCDC's periodic review the only method for correcting goal noncompliance that results[, *inter alia*,] from changes in circumstances after acknowledgment.' 80 Or App at 181. The present case *is* a periodic review proceeding in which corrective action of the kind mentioned in *Urquhart* can be required. The question of goal compliance that is presented in periodic review proceedings is preeminently one of state law and local compliance, and LCDC, not the local government, determines whether the latter is in compliance." 115 Or App at 471-72. (Emphasis in original; footnote omitted.)

We therefore agreed with LCDC that the periodic review statutes "[confer] authority on it to establish affirmative requirements," including the requirement that the local government add specific language or provisions to its land use legislation. 115 Or App at 471.

The county attempts to distinguish *Yamhill County v. LCDC, supra*, by emphasizing the differences between the Goal 5 rule and process that were involved there and the Goal 3 rules and process that are presented in this case. We do not agree with the county's distinction. Although we also discussed the Goal 5 rule, the clear thrust of our reasoning in *Yamhill County* was concerned with the role that the relevant acknowledgment and periodic review statutes assign LCDC and DLCD. That role is to assure that local land use legislation complies with the statewide goals and LCDC's rules. The statutes vest LCDC and DLCD with affirmative corrective authority, rather than restricting them to the passive status that the county suggests.

Moreover, as LCDC contends in its brief, its ability to require that local legislation contain particular provisions or that it spell out with particularity how it complies with statewide standards can be essential to assuring that, after acknowledgment or periodic review, the local legislation will be interpreted and applied by the local government in a manner that is consistent with the state standards. That concern assumes particular importance in the light of the limited scope of review that *Clark v. Jackson County*, 313 Or 508, 836 P2d 710 (1992), gives LUBA and the courts over local interpretations of acknowledged local legislation.

As we explained in *Cope v. City of Cannon Beach*, 115 Or App 11, 836 P2d 775 (1992), *rev allowed* 315 Or 643 (1993), local legislation replaces the goals as the applicable body of standards for the local governments' land use decisions after the legislation is acknowledged as complying with the goals.[1] We noted that, in theory, "if the local legislation complies with state law, its correct application to specific land use decisions will assure their consistency with state law." We cautioned, however, that local "legislation that complies *facially* with the statewide requirements can be interpreted in ways that are inconsistent with state law." 115 Or App at 18. (Emphasis in original.) It is within LCDC's authority to reduce that danger by requiring, as part of the acknowledgment and of the periodic review process, that the local legislation embody the state requirements specifically enough to make it unlikely that a later interpretation by the local government will be inconsistent with those requirements.

ORS 197.013 makes it clear that ongoing goal compliance in the way acknowledged legislation is applied is as critical to the statutory scheme as is the initial determination of facial compliance. The more specific a local government's legislation is at the time of acknowledgment or periodic review, the less the risk is that the legislation could later be interpreted or applied in a manner that is contrary to the goals and that would not be redressable by LUBA or the courts under the standard of review established in *Clark v. Jackson County, supra.* As we did in *Yamhill County v.*

---

[1] However, state *statutes* remain applicable to local decisions after acknowledgment. *See Forster v. Polk County*, 115 Or App 475, 478, 839 P2d 241 (1992), and authorities there cited.

*LCDC, supra*, we hold that LCDC had the statutory authority to impose specific affirmative requirements of the kind that it did here.

■ The foregoing discussion fully answers the third of the county's four assignments, and also adversely resolves the principal argument it makes in support of its others. The remaining contention that calls for discussion under the county's first assignment is that LCDC misapplied its own rules in determining that the county's selected minimum lot sizes were not adequate in all instances to carry out the mandate of Goal 3 that minimum lot sizes in EFU areas be "appropriate for the continuation of the existing commercial agricultural enterprise within the area."

Relatedly, the county challenges LCDC's rejection of the county's determination that farms with annual gross receipts of at least $10,000 are "representative of existing commercial farms in Yamhill County." Rather, LCDC concluded, "it is those farms which earn an annual gross income of at least $40,000 that make a substantial contribution to the county's existing agricultural economy," OAR 660-05-005(2)(a), and that farms with the greater earning capacity accounted for approximately 90 percent of the county's farm sales in recent years. LCDC also found that farms of more than 40 acres comprise over 90 percent of the land in agricultural use in the county, and that commercial farms of more than 80 acres account for over half of the county's land in farm use. Taking that and other information in the record together, LCDC concluded that the county's methodology did not distinguish sufficiently between commercial and noncommercial farms, did not support its selection of minimum lot sizes necessary to continue the existing commercial agricultural enterprise and would allow divisions of a majority of the county's commercial farm parcels.

Much of the county's argument is devoted to the proposition that LCDC is not an expert agency and that we owe no deference to its interpretation of its own rules. *But see 1000 Friends of Oregon v. LCDC (Lane Co.)*, 305 Or 384, 752 P2d 271 (1988). The county also contends that there was substantial evidence in the record to support its findings

concerning the compliance of its periodic review order with Goal 3 and the Goal 3 rules.[2]

We do not agree with the county that the question here turns to any significant degree on the evidentiary support for its findings. Rather, the question is whether the findings lead to a correct conclusion under the proper legal standard. *See 1000 Friends of Oregon v. LCDC (Lane Co.), supra*, 305 Or at 406-07. LCDC concluded that the county had not justified its minimum lot size determinations as satisfying the goal and rule requirements concerning the continuation of the existing commercial agricultural enterprise. Whatever deference we may or may not owe LCDC's application of its rules, we agree with LCDC that, as a matter of law, the county's minimum lot size determinations would allow parcelization and would otherwise frustrate the objective of the goal and rules to perpetuate the county's commercial agricultural enterprise.

The county's contentions regarding farm income levels appear to be aimed at LCDC's requirement that the county use the higher income figure as one of its approval standards for farm dwellings, as well as being directed at LCDC's rejection of the county's identification of commercial farms and of its establishment of minimum lot sizes. However, those matters are interrelated. Income and other performance standards are relevant to determining what farming operations are commercial, and that determination is, in turn, relevant in assessing the lot sizes that are necessary to continue the existing commercial agricultural enterprise. *See* Goal 3; OAR 660-05-005(2); OAR 660-05-015(1), (6); *Still v. Marion County*, ___ Or LUBA ___ (LUBA No. 91-092, November 15, 1991). We reject the county's argument as it relates to each of those questions, and we reject its first assignment.

■ In its second assignment, the county challenges LCDC's directive that it establish a mixed agricultural/forest designation and zone. The county maintains that LCDC was foreclosed from requiring that because, in an earlier remand

---

[2] Although it is not entirely clear what the county understands the "record" to consist of, we note that it includes the director's report and various other components as well as the record of the local proceedings. *Former* ORS 197.647(2)(d).

order, it had not required the county to address Goal 4 issues. The county further argues that LCDC's action was meant to implement new Goal 4 rules, which were not in effect at the time of the proceeding, and with which the county should not have been required to comply until the time of the next periodic review. In addition to responding directly to those contentions, LCDC asserts that "the adoption of a mixed forest and agricultural zone addresses both agricultural and forest lands issues. In this case, the adoption was necessary to comply with Goal 3," because LCDC

"found that the western Coast Range foothills included a mix of agricultural and forest uses. That is, in its review of the county's agricultural lands, it found some lands appropriate for either agricultural use, forest use, or both such uses. Apparently, this information was not fully understood in 1989 when [LCDC] advised the county that the issues for further periodic review would be under Goals 3 and 5. Under *former* ORS 197.647(5), new objections to the county's periodic review order may be raised when one set of required amendments affect other periodic review issues which could not have been raised previously. Here, the review for compliance with Goal 3 revealed matters affecting Goal 4 issues. [LCDC] correctly moved to require interim planning until the new Goal 4 rules were effective."

We agree with LCDC, at least insofar as it justifies the mixed zone requirement on the basis of Goal 3 considerations, which in turn gave rise to Goal 4 concerns. We do not find the county's second assignment of error persuasive. Its remaining assignment requires no discussion, except to note that it, too, rests on the premise that a Goal 4 issue was presented, when Goal 3 was the basis for the challenged decision.

■ 1000 Friends' first two assignments take issue with parts of LCDC's order that allow for 20-acre and 40-acre minimum lot sizes in some of the agricultural "subareas" of the county. Neither assignment demonstrates error. In its third assignment, 1000 Friends argues that LCDC acted inconsistently with its rules by allowing "farm dwellings to be placed on preexisting lots or parcels smaller than the size determined appropriate to maintain the existing commercial agricultural enterprises" in certain areas.

OAR 660-05-025(1) provides:

"The Goal 3 standard on minimum lot sizes is applied to approval of farm dwellings on pre-existing lots to prevent increased development from interfering with neighboring farms. The minimum lot size standard requires that a distinction be made between farm and nonfarm parcels. If the pre-existing lot meets the minimum lot size standard, a new dwelling can be reviewed to determine if it is a dwelling customarily provided in conjunction with farm use as required by ORS 215.213(1)(g) or 215.283(1)(f). If the lot does not meet the standard, the new dwelling will be considered a nonfarm residence. Otherwise, a nonfarm residence must be approved subject to the conditions set forth in ORS 215.213(3) or 215.283(3). The minimum lot size standard applies to each successive dwelling proposed to be located on an existing lot, except dwellings approved pursuant to ORS 215.213(1)(e) or 215.283(1)(e)."

OAR 660-05-030(2) provides:

"The Goal 3 standard for minimum lot sizes is used to distinguish between farm and nonfarm parcels as it is applied according to OAR 660-05-015. Dwellings customarily provided in conjunction with farm use are authorized on parcels which are large enough to satisfy the Goal 3 minimum lot size standard (i.e., appropriate for the continuation of the existing commercial agricultural enterprise within the area). Dwellings proposed for new or existing parcels which do not satisfy the Goal 3 minimum lot size standard under OAR 660-05-020 are considered nonfarm dwellings and can only be approved according to ORS 215.213(3) or 215.283(3)."

1000 Friends argues that the part of LCDC's order authorizing "farm dwellings on existing parcels less than the minimum lot size for the area" is contrary to those rules. LCDC responds that that argument wrongly reads the term "Goal 3 standard for minimum lot sizes" as referring only to fixed minimum lot sizes. However, OAR 660-05-015(3) establishes alternative formulations of the standard, of which the fixed lot size approach is only one. That rule provides:

"The Goal 3 minimum lot size standard can be applied in various ways, including but not limited to the following:

"(a) To determine one specific acre size, which is used for both farm and nonfarm uses, or for only farm uses, with the size for nonfarm uses decided case-by-case;

"(b) To determine different acre sizes, which are used for farm and nonfarm uses, different types of farms (crops and practices), or different areas of the county; or

"(c) To determine performance standards, which are used to decide appropriate lot sizes for farm and nonfarm uses on a case-by-case basis."

LCDC explains that the challenged part of the order simply gives effect to all three of those alternatives for purposes of authorizing farm dwellings and that the order is consistent with the rules as a whole. We agree.[3]

■ OIA argues that the effect of the regulation of agricultural lands and uses required by LCDC's order will be to take the property of county farm owners without just compensation and to establish a conservation easement. ORS 271.715 *et seq.* We are not persuaded by that argument for the reasons we stated in response to OIA's similar argument in *Oregonians in Action v. LCDC*, 106 Or App 721, 725-26, 809 P2d 718 (1991). *See also Larson v. Multnomah County*, 121 Or App 119, 854 P2d 476 (1993).

Affirmed on petitions and on cross-petition.

---

[3] The order also contained a fourth standard, relating to farms comprised of noncontiguous parcels. 1000 Friends does not question that standard or any of the others specifically, but contends generally that no dwellings may be allowed on parcels or lots with less acreage than the fixed minimum size.