In re Aaron STAMP and Kelly
Stamp, Plaintiffs

v.

The VAIL CORPORATION, a Colorado
corporation, d/b/a Vail Associates, Inc.;
and Mark Chard, Defendants

and

Terry Delliquadri, Third Party Defendant.

No. 07SA65.

Supreme Court of Colorado,
En Banc.

Nov. 19, 2007.

Rehearing Denied Dec. 17, 2007.

Purvis, Gray & Murphy, LLP, James G. Heckbert, William R. Gray, Lettunich & Vanderbloemen, LLC, John A. Vanderbloemen, Steamboat Springs, Colorado, Attorneys for Plaintiffs.

The Rietz Law Firm, LLC, Peter W. Rietz, Kimberly A. Viergever, Dillon, Colorado, Attorneys for Defendants.

Justice BENDER delivered the Opinion of the Court.

## I. Summary

In this original proceeding, we review the trial court's ruling that recovery of compensatory damages in a skiing-related wrongful death action is limited by the Ski Safety Act's damages cap provision, and not by the Wrongful Death Act's damages cap provision.[1] Under Petitioners' theory of recovery,

---

1. This skiing-related wrongful death action involves the intersection of the Ski Safety Act ("SSA"), §§ 33–44–101 to–114, C.R.S. (2007), and the Wrongful Death Act ("WDA"), §§ 13–21–201 to –204, C.R.S. (2007). In particular, this case involves the intersection of the damages cap

provisions contained in section 33–44–113 of SSA and in section 13–21–203(1)(a) of the WDA.
 The SSA's damages cap provision provides:
 The total amount of damages which may be recovered from a ski area operator by a skier who uses a ski area for the purpose of skiing ... and who is *injured* ... shall not exceed one

the felonious killing exception contained in the WDA's damages cap provision would entitle them to unlimited compensatory damages for the death of their daughter. In this opinion, we also review the trial court's ruling that denied Petitioners' motion to amend their complaint to add a claim for exemplary damages.

We affirm the trial court's ruling regarding the damages cap issue and hold that the SSA's damages cap provision limits recovery of compensatory damages in skiing-related wrongful death claims. However, we also hold that the trial court erred in denying Petitioners' motion to amend their complaint to add a claim for exemplary damages. Upon review of the discovery documents in this case, we conclude that Petitioners' amended complaint satisfies the burden of proof set forth in the WDA's exemplary damages provision,[2] and hold that the trial court abused its discretion when it denied this motion.

Hence, we discharge the rule to show cause as to the damages cap issue, but make the rule absolute as to Petitioners' claim for exemplary damages.

## II. Original Jurisdiction

Exercise of our original jurisdiction is within our sole discretion. C.A.R. 21(a)(1). Relief under C.A.R. 21 is proper in cases where the trial court has abused its discretion and where an appellate remedy would be inadequate. *Fognani v. Young*, 115 P.3d 1268, 1271 (Colo.2005). We generally elect to hear C.A.R. 21 cases that raise issues of first impression and that are of significant public importance. *Wesp v. Everson*, 33 P.3d 191, 194 (Colo.2001). We have previously exercised our original jurisdiction to review questions of statutory interpretation. *See, e.g., Bd. of County Comm'rs v. Colo. Pub. Util. Comm'n*, 157 P.3d 1083, 1085–86 (Colo.2007). We have also previously exercised our original jurisdiction to review rulings on motions to amend. *See, e.g., Polk v. Dist. Court*, 849 P.2d 23, 24 (Colo.1993).

This court has never before considered how the SSA's damages cap provision intersects with the WDA's damages cap provision in a wrongful death action in which a skier died as a result of the alleged negligence of a ski area operator. This is an important issue in Colorado. The SSA is one of the most extensive and significant ski safety and liability statutory schemes in the country. *See* Arthur N. Frakt & Janna S. Rankin, *Surveying the Slippery Slope: The Questionable Value of Legislation to Limit Ski Area Liability*, 28 Idaho L.Rev. 227, 258–70 (1992). Furthermore, ski tourism is important to Colorado's economy. *Schafer v. Aspen Skiing Corp.*, 742 F.2d 580, 584 (10th Cir.1984) ("The ski industry makes a substantial contribution, directly or indirectly, to the Colorado economy. The state has a legitimate interest in its well-being and economic viability."); *see also* James H. Chalat, *Colorado Ski Law*, 27 Colo. Law., Feb. 1998, at 5, 5. Given these concerns, we deem the exercise of our original jurisdiction appropriate in this case.

## III. Facts and Procedural History

This case involves a fatal collision at a ski area between a ski racer and a snowmobile

million dollars, present value, including any derivative claim by any other claimant, which shall not exceed two hundred fifty thousand dollars, present value, and including any claim attributable to noneconomic loss or injury as defined in sections [sic] 13–21–102.5(2), C.R.S., whether past damages, future damages, or a combination of both, which shall not exceed two hundred fifty thousand dollars.
§ 33–44–113, C.R.S. (2007) (emphasis added).
The WDA's damages cap provision provides: Notwithstanding anything in this section or in section 13–21–102.5 to the contrary, there shall be no recovery ... for noneconomic loss or injury in excess of two hundred fifty thousand dollars, unless the wrongful act, neglect,

or default causing death constitutes a felonious killing.
§ 13–21–203(1)(a), C.R.S. (2007).

**2.** The WDA's exemplary damages provision provides:

A claim for exemplary damages in an action governed by this section may not be included in any initial claim for relief. A claim for exemplary damages in an action governed by this section shall be allowed by amendment to the pleadings only after the passage of sixty days following the exchange of initial disclosures ... and the plaintiff establishes prima facie proof of a triable issue.
§ 13–21–203(3)(c)(I), C.R.S. (2007).

driven by an employee of the ski area operator's race crew. Petitioners Aaron and Kelly Stamp ("Stamps") brought this wrongful death action in Eagle County District Court against Respondents Vail Corporation ("Vail") and Mark Chard ("Chard")[3] after the Stamps' thirteen-year-old daughter, Ashley Stamp ("Ashley"), died in a collision with a snowmobile driven by Chard, an employee of Vail's race crew.

As Ashley skied a warm-up run down the west side of Vail's Golden Peak race arena, Chard drove himself and another race crew employee up the same slope by snowmobile. Ashley and Chard approached a blind knoll at the same time and collided, causing Ashley's death. The depositions, affidavits, and police reports submitted to the trial court contain conflicting facts concerning the manner in which Chard was driving the snowmobile.

Chard states that he is an experienced snowmobile driver and that he had driven a snowmobile up the west side of the race arena between fifty and one hundred times that ski season. A police report states that Chard told an investigating law enforcement officer that he stopped and waited for four other skiers to pass him below another blind knoll. Chard states that he does not remember seeing or stopping for the four skiers.

Regarding the collision, Chard states that his speed before the collision was between ten and fifteen miles per hour and that he slowed down as he approached the blind knoll. Edward Lockwood, a ski coach who was standing below the knoll at the time of the collision, estimates that the snowmobile's speed was between twenty and twenty-five miles per hour. Likewise, Dean Havlik, the medical doctor and forensic pathologist who performed Ashley's autopsy, states that Ashley's injuries indicate that the snowmobile's speed was between twenty and twenty-five miles per hour.

Scott Shepard, a race coach who witnessed the collision, states that the front of the snowmobile lifted about one foot off of the ground as it crested the knoll. Lockwood, who also states that he saw the snowmobile lift off of the ground when it crested the knoll, estimates that the front of the snowmobile was eighteen to twenty-four inches in the air.

In addition, Chard states that the snowmobile's siren was turned on. Thom Conville, Chard's passenger and fellow race crew employee, also remembers that he heard the snowmobile's siren before the collision. However, both Shepard and Lockwood state that they never heard the snowmobile's siren.

All of these facts were presented to the trial court on Vail's motion for summary judgment. The trial court denied Vail's motion, finding that whether Chard's speed was excessive and whether the snowmobile's siren was turned on were "triable issues of fact" that relate to the Stamps' claims of "negligence, recklessness, and wanton and willful conduct."

After the trial court denied Vail's motion for summary judgment, Vail moved for a determination of law as to whether section 33–44–113 of the SSA ("SSA's damages cap provision") or section 13–21–203(1)(a) of the WDA ("WDA's damages cap provision") limits the Stamps' recovery in this case. If the SSA's damages cap provision applies to ski-ing-related wrongful death claims, then the Stamps' recovery of compensatory damages will be limited to $250,000. *See* § 33–44–113. If the WDA's damages cap provision applies to skiing-related wrongful death claims, then the Stamps' recovery of compensatory damages will also be limited to $250,000 unless the Stamps prove that Ashley's death constitutes a "felonious killing," in which case the felonious killing exception contained in the WDA's damages cap provision will permit the Stamps to recover unlimited compensatory damages. *See* § 13–21–203(1)(a). Among the Stamps' claims for relief is a claim alleging felonious killing.

Following Vail's motion for a determination of law, the Stamps moved to amend their complaint to add a claim for exemplary damages on the ground that Vail's conduct was "willful and wanton."

---

3. Vail named one of Ashley Stamp's coaches, Terry Delliquadri, a third-party defendant in the case. He filed no brief or other document with this court.

In separate orders, the trial court ruled that the SSA's damages cap provision, and not the WDA's damages cap provision, limits the Stamps' recovery of compensatory damages, and denied the Stamps' motion to amend their complaint to add a claim for exemplary damages. In its ruling on the damages cap issue, the trial court construed the term "injured" as it is used in the SSA's damages cap provision to mean "injury or death," and interpreted the phrase "any derivative claim by any claimant" contained in the SSA's damages cap provision to include wrongful death claims. For this reason, the trial court concluded that the SSA's damages cap provision limits recovery of compensatory damages in skiing-related wrongful death actions in the same way that it limits recovery of compensatory damages in skiing-related personal injury actions. The trial court also concluded that the felonious killing exception contained in the WDA's damages cap provision does not apply to skiing-related wrongful death claims. Thereafter, the trial court denied, without explanation, the Stamps' motion to amend their complaint to add a claim for exemplary damages. Thus, under the trial court's ruling, the Stamps' recovery of compensatory damages will be limited to $250,000, and their recovery of exemplary damages will be barred.

The Stamps petitioned this court for review of both rulings. We issued a rule to show cause. We now discharge the rule in part and make it absolute in part.

## IV. Analysis

First, the Stamps argue that the legislature's use of the exclusive term "injured" and of the phrase "any derivative claim by any claimant" in the SSA's damages cap provision precludes application of the SSA's damages cap provision to skiing-related wrongful death actions. Second, the Stamps contend that the WDA's felonious killing exception, which provides for unlimited damages, applies to their skiing-related wrongful death claim because the felonious killing exception applies to all wrongful death claims in which the defendant's conduct is allegedly willful and wanton. Finally, the Stamps challenge the trial court's denial of their motion to amend their complaint to add a claim for exemplary damages on the ground that their claim was timely filed and established prima facie proof of a triable issue that Vail's conduct was willful and wanton. In effect, the Stamps seek unlimited recovery of compensatory damages under the WDA's felonious killing exception as well as exemplary damages under the WDA's exemplary damages provision, while Vail seeks to limit the Stamps' recovery of compensatory damages to $250,000 under the SSA's damages cap provision and to prohibit their recovery of exemplary damages.

To address these issues, we first construe the intersection of the damages caps contained in the SSA and the WDA and explain why the SSA's damages cap provision limits recovery of compensatory damages in wrongful death actions. Next, we consider whether the felonious killing exception, which is contained in the WDA's damages cap provision and which provides for unlimited compensatory damages, applies to skiing-related wrongful death claims and determine that it does not. Finally, we review the trial court's denial of the Stamps' motion to amend their complaint to add a claim for exemplary damages and conclude that the motion should have been granted.

## A. The SSA's Damages Cap Provision Limits Recovery of Compensatory Damages in Skiing–Related Wrongful Death Actions

■ At first blush, the Stamps' argument that the term "injured" as it is used in the SSA's damages cap provision means "injury," and not "injury or death," seems to have merit because the SSA's damages cap provision uses the term "injured" and does not contain the word "death."

Upon closer review, however, the statutory purpose of the SSA leads us to construe the term "injured" broadly to include death and to hold that the SSA's damages cap provision limits the recovery of compensatory damages in skiing-related wrongful death actions.

■ We review the proper construction of statutes de novo. *Mishkin v. Young,* 107 P.3d 393, 396 (Colo.2005). When legislative

language is unambiguous, we give effect to the plain and ordinary meaning of the statute without resorting to other rules of statutory construction. *In re Ballot Title 1997–1998 No. 62*, 961 P.2d 1077, 1079 (Colo.1998). However, when the language of a statute is ambiguous or capable of more than one meaning, we construe the statute in light of the General Assembly's objective. *Id.*

■ If a statute is ambiguous, then we may consider, among other factors, the consequences of a particular construction and the legislative declaration. § 2–4–203(1)(e) & –203(1)(g), C.R.S. (2007). Often the best guide to legislative intent is the context in which the statutory provisions appear and any accompanying statement of legislative policy, such as a legislative declaration. *People v. Cross*, 127 P.3d 71, 73 (Colo.2006); *Common Sense Alliance v. Davidson*, 995 P.2d 748, 755 (Colo.2000).

In 1979, the SSA was enacted to define the rights, responsibilities, and liabilities of both skiers and ski area operators:

> Legislative declaration.... [T]he purpose of this article is ... to further define the legal responsibilities of ski area operators and their agents and employees; to define the responsibilities of skiers using such ski areas; and to *define the rights and liabilities existing between the skier and the ski area operator* and between skiers.

Ch. 323, sec. 1, § 33–44–102, 1979 Colo. Sess. Laws 1237, 1237 (emphasis added).

Consistent with this purpose, the SSA prescribes various duties of ski area operators such as posting conspicuous warning signs and markings, and operating maintenance and snow-grooming equipment with care. §§ 33–44–106 to –108.[4] The SSA also identifies several responsibilities of skiers including maintaining speed control and staying clear of all man-made obstacles. §§ 33–44–105 & –109.[5] A violation of a duty or responsibility enumerated in the SSA constitutes negligence per se. § 33–44–104(1).[6]

In 1990, the SSA was amended to clarify the law regarding these duties and responsibilities, and to reduce for ski area operators the amount, unpredictability, and expense of litigation arising from skiing accidents:

> Legislative declaration. The general assembly hereby finds and declares that ... despite the passage of the "Ski Safety Act of 1979", [sic] ski area operators of this state continue to be subjected to claims and litigation involving accidents which occur during the course of the sport of snow skiing, *which claims and litigation and threat thereof unnecessarily increase Colorado ski area operators' costs*. The general assembly further finds that such increased costs are due, in part, to confusion under the "Ski Safety Act of 1979" as to whether a skier accepts and assumes the dangers and risks inherent in the sport of skiing. It is the purpose of this act, therefore, *to clarify the law in relation to skiing injures and the damages and risks inherent in that sport*.

Ch. 256, sec. 1, 1990 Colo. Sess. Laws 1540, 1540 (emphasis added).[7] By narrowly defin-

---

**4.** Section 33–44–106 of the SSA is titled, "Duties of operators—signs"; section 33–44–107 of the SSA is titled, "Duties of ski area operators—signs and notices required for skiers' information"; and section 33–44–108 of the SSA is titled, "Ski area operators—additional duties."

**5.** Section 33–44–105 of the SSA is titled, "Duties of passengers" and section 33–44–109 of the SSA is titled, "Duties of skiers-penalties."

**6.** Section 33–44–104(1) of the SSA states: "A violation of any requirement of this article shall, to the extent such violation causes injury to any person or damages to property, constitute negligence on the part of the person violating such requirement."

**7.** The legislative declaration introducing the 1990 amendments was not codified like the legislative declaration introducing the SSA in 1979 was. Nevertheless, this court treats the two legislative declarations as equal in authority. *See Bayer v. Crested Butte Mountain Resort, Inc.*, 960 P.2d 70, 84 (Colo.1998); *Graven v. Vail Assocs., Inc.*, 909 P.2d 514, 517–18 & 518 n. 3 (Colo. 1995).

According to the *Colorado Legislative Drafting Manual*, which is prepared by the Colorado Office of Legislative Legal Services, a legislative declaration is an "explicit or formal statement or announcement about the legislation ... that indicates the problem the General Assembly is trying to address." Colo. Office of Legis. Legal Servs., *Colorado Legislative Drafting Manual* 2–41 (Feb. 2004). The manual is silent as to when a legislative declaration ought to be codified.

ing the claims that can be brought by injured skiers against ski area operators and by limiting the recovery in successful skiers' claims, the 1990 amendments broaden the SSA's protection of ski area operators.

A key section of the 1990 amendments is the SSA's damages cap provision, which controls injured skiers' claims by limiting the total amount of compensatory damages that may be recovered from a ski area operator to $1,000,000 and by limiting recovery for derivative claims and claims for noneconomic damages to $250,000:

> The total amount of damages which may be recovered from a ski area operator by a skier ... who is *injured* ... shall not exceed one million dollars, present value, including any derivative claim by any other claimant, which shall not exceed two hundred fifty thousand dollars, present value, and including any claim attributable to noneconomic loss or injury, ... which shall not exceed two hundred fifty thousand dollars, present value.

Ch. 256, sec. 7, § 33–44–113, 1990 Colo. Sess. Laws 1540, 1543 (emphasis added).

Another key section of the 1990 amendments is section 33–44–112 of the SSA ("SSA's inherent dangers and risks provision"), which immunizes ski area operators from liability for skiers' injuries that are caused by statutorily defined "inherent dangers and risks of skiing": "[N]o skier may make any claim against or recover from any ski area operator for *injury* resulting from any of the inherent dangers and risks of skiing." Ch. 256, sec. 7, § 33–44–112, 1990 Colo. Sess. Laws 1540, 1543 (emphasis added).[8]

To ensure that the SSA is the law that governs ski area liability in general, and liti-gation arising from skiing accidents in particular, the 1990 amendments added another section which provides that the SSA prevails over inconsistent laws or statutes: "Insofar as any provision of law or statute is inconsistent with the provisions of this article, this article controls." Ch. 256, sec. 7, § 33–44–114, 1990 Colo. Sess. Laws 1540, 1544.

The cumulative effect of these provisions gives the SSA primary control over litigation arising from skiing accidents. We have previously stated that when taken together, the provisions of the SSA "leave[ ] no doubt as to the legislative intent to set forth the governing law concerning ski area liability: both with respect to operation of ski slopes and ski lifts." *Bayer v. Crested Butte Mountain Resort, Inc.*, 960 P.2d 70, 84 (Colo.1998).

When we construe a statute, our goal is to determine the legislative intent and to adopt the statutory construction that best effectuates the purposes of the legislative scheme. *Mishkin*, 107 P.3d at 396. To effectuate the intent of the legislature, a statute must be read and considered as a whole and should be interpreted so as to give consistent, harmonious, and sensible effect to all of its parts. *Id.* When a statutory term may be used in a different sense, it is permissible for the court to apply the definition that will best effectuate the intent of the legislature. *Clown's Den, Inc. v. Canjar*, 33 Colo.App. 212, 518 P.2d 957, 958 (1973).

As a whole, the SSA's 1990 amendments broaden the SSA's protection of ski area operators by narrowly defining the claims that can be brought against ski area operators by skiers who are injured while skiing, and by limiting recovery of compensatory damages in successful skiers' claims. To

---

**8.** Section 33–44–103(3.5) of the SSA broadly defines the term "inherent dangers and risks of skiing":

"Inherent dangers and risks of skiing" means those dangers or conditions that are part of the sport of skiing, including changing weather conditions; snow conditions as they exist or may change, such as ice, hard pack, powder, packed powder, wind pack, corn, crust, slush, cut-up snow, and machine-made snow; surface or subsurface conditions such as bare spots, forest growth, rocks, stumps, streambeds, cliffs, extreme terrain, and trees, or other natural objects, and collisions with such natural objects; impact with lift towers, signs, posts, fences or enclosures, hydrants, water pipes, or other man-made structures and their components; variations in steepness or terrain, whether natural or as a result of slope design, snowmaking or grooming operations, including but not limited to roads, freestyle terrain, jumps, and catwalks or other terrain modifications; collisions with other skiers; and the failure of skiers to ski within their own abilities.

best effectuate the legislative intent to broaden the SSA's protection of ski area operators, the term "injured" as it is used in the SSA's damages cap provision must be construed broadly to include death. To do otherwise, and narrowly construe the term "injured" to exclude death, would be inconsistent with the express purpose of these amendments and of the SSA's overall legislative scheme.

For example, if the term "injured" were construed narrowly to exclude death, then the WDA's damages cap provision, and not the SSA's damages cap provision, would control recovery of compensatory damages in skiing-related wrongful death actions. This construction would create unpredictability regarding the expense of litigation to ski area operators that arises from skiing accidents. On one hand, the felonious killing exception contained in the WDA's damages cap provision would allow the heirs of a skier who died to recover unlimited compensatory damages from the ski area operator if the skiing accident that caused the death constituted a felonious killing, as the Stamps have alleged in their complaint. On the other hand, if the skier were to survive the skiing accident, then the SSA's damages cap provision would limit his recovery of compensatory damages to $1,000,000.

This result would leave ski area operators uncertain as to the maximum amount of compensatory damages that may be recovered from them in litigation arising from skiing accidents that result in death. Because the purpose of the 1990 amendments was to make the expense of skiing-related litigation more predictable, this is an incongruous result.

A narrow construction of the term "injured" to exclude death would also bifurcate control over litigation arising from skiing accidents so that the WDA's damages cap provision would control accidents that result in death, while the SSA's damages cap provision would control accidents that fall short of death. This narrow construction of the SSA would contravene the legislature's intent "to set forth the governing law concerning ski area liability," *Bayer,* 960 P.2d at 84, and would subvert the SSA's mandate that it

prevails over inconsistent laws or statutes, § 33–44–114.

A broad construction of the word "injured" as it is used in the SSA's damages cap provision is analogous to the construction of the term "injury" as it is used in the SSA's inherent dangers and risks provision by Colorado's federal courts. The SSA's inherent dangers and risks provision broadens the SSA's protection of ski area operators by immunizing them from liability for skiers' injuries that are caused by statutorily defined "inherent dangers and risks of skiing." § 33–44–112 (precluding claims against "any ski area operator for *injury* resulting from any of the inherent dangers and risks of skiing") (emphasis added).

Although the SSA's inherent dangers and risks provision uses the term "injury" and does not contain the word "death," it has been applied in Colorado's federal courts to immunize ski area operators from liability in skiing-related wrongful death actions. *See Gifford v. Vail Resorts, Inc.,* 37 F.App'x 486, 488, 2002 WL 1303222 (10th Cir.2002) (unpublished) (affirming a jury verdict immunizing a ski area operator from liability because the skier's death was caused by an inherent danger or risk of skiing); *Rowan v. Vail Holdings, Inc.,* 31 F.Supp.2d 889, 903 (D.Colo.1998) (holding that there was sufficient evidence to submit the question of whether a skier's death was caused by an inherent danger or risk of skiing to the jury).

By applying the SSA's inherent dangers and risks provision to skiing-related wrongful death actions, the federal courts in *Gifford* and *Rowan* implied that the term "injury" as it is used in the SSA's inherent dangers and risks provision includes death. We note that these federal cases involve the section of the SSA that directly precedes the section we interpret in this case. These cases, then, reflect a broad construction of the word "injured" that is consistent with the legislative purpose of the 1990 amendments.

To support their argument in favor of a narrow construction of the term "injured" that excludes death, the Stamps point to the General Assembly's use of the phrase "injury or death" in section 33–44–110 of the SSA ("SSA's competition provision"), and its use

of the term "injured" alone in the SSA's damages cap provision. According to the Stamps, this suggests that the General Assembly purposefully excluded the term "death" from the SSA's damages cap provision. When we view this argument in the context of the 1990 amendments' aim to broaden the SSA's protection of ski area operators, we are not convinced.

The SSA's competition provision was enacted in 1979 to immunize ski area operators from liability for "injury or death" sustained by a competitor in statutorily specified circumstances. Ch. 323, sec. 1, § 33–44–110, 1979 Colo. Sess. Laws 1237, 1243.[9] The provision remained unchanged in 1990, but it was amended in 2004 to immunize ski area operators from liability for injury or death sustained by competitors on "freestyle terrain" or in "collisions with another competitor." Ch. 323, sec. 2, § 33–44–110, 2004 Colo. Sess. Laws 1382, 1384.[10] Like the 1990 amendments did, the 2004 amendment broadened the SSA's protection of ski area operators.

The SSA's competition provision does not immunize Vail from liability in this case because the collision here was not a circumstance specified in the statute. Although Ashley was a competitor because she was a skier "practicing for competition" under section 33–44–103(2),[11] the fatal collision was neither with another skier nor caused by "course, venue, or area conditions that a visual inspection should have revealed" under section 33–44–110(2). Hence, Ashley is treated not as a competitor, but rather as any other skier would be treated under the SSA.

When a skier is injured in a skiing accident, we must look to the SSA's 1990 and 2004 amendments to determine whether and to what extent the skier can recover from the ski area operator. Consistent with the purpose of the 1990 and 2004 amendments to broaden the SSA's protection of ski area operators, the SSA's damages cap provision functions to limit the amount of compensatory damages a skier can recover from a ski area operator. Therefore, although the Stamps' statutory argument that the General Assembly intended to exclude death from the SSA's damages cap provision is plausible, our responsibility is to consider the legislative scheme of the SSA as a harmonious whole and to effectuate the legislative purpose of the 1990 and 2004 amendments. Accordingly, we construe the term "injured" to include death, consistent with the broad purpose of the SSA to reduce for ski area operators the amount, unpredictability, and expense of litigation arising from skiing accidents.

The Stamps also argue that the phrase "any derivative claim by any other claimant" contained in the SSA's damages cap provision refers to derivative claims arising from a skier's injury and not those arising from a skier's death, and therefore the term "injured" as it is used in the SSA's damages cap provision excludes death.

9. The SSA's competition provision was enacted in 1979 to read:

> The competitor shall be held to assume the risk of all course conditions including, but not limited to, weather and snow conditions, course construction or layout, and obstacles which a visual inspection should have revealed. No liability shall attach to a ski area operator for *injury* or death of any competitor proximately caused by such assumed risk.

Ch. 323, sec. 1, § 33–44–110, 1979 Colo. Sess. Laws 1237, 1243 (emphasis added).

10. The SSA's competition provision now reads:

> The competitor shall be held to assume the risk of all course, venue, or area conditions, including, but not limited to, weather and snow conditions; obstacles; course or feature location, construction, or layout; *freestyle terrain* configuration and conditions; and other courses, layouts, or configurations of the area to be used. No liability shall attach to a ski area operator for injury or death to any competitor caused by course, venue, or area conditions that a visual inspection should have revealed or by *collisions with other competitors*.

§ 33–44–110(2) (emphasis added).

Section 33–44–103(3.3) of the SSA broadly defines the term "freestyle terrain" to include "terrain parks and terrain park features such as jumps, rails, fun boxes, and all other constructed and natural features, half-pipes, quarter-pipes, and freestyle-bump terrain."

11. Section 33–44–103(2) of the SSA defines the term "competitor" to mean: "a skier actually engaged in competition, a special event, or training or *practicing for competition* or a special event on any portion of the area made available by the ski area operator" (emphasis added).

██ ██ The phrase "any derivative claim by any other claimant" contained in the SSA's damages cap provision uses the word "any" to modify the phrase "derivate claim." § 33–44–113. When used as an adjective in a statute, the word "any" means "all." *Winslow v. Morgan County Commr's*, 697 P.2d 1141, 1141 (Colo.App.1985). Wrongful death claims are derivative in nature. *Pizza Hut of Am., Inc. v. Keefe*, 900 P.2d 97, 102 (Colo. 1995). To accept the Stamps' argument would lead to the illogical conclusion that the adjective "any" means "less than all." We follow our case law precedent and construe the phrase "any derivative claim by any other claimant" to mean "all derivative claims by any other claimant" and to include skiing-related wrongful death claims.

Lastly, the Stamps argue that the WDA's felonious killing exception applies to all wrongful death claims, including those that are skiing-related. The WDA's damages cap provision limits the recovery of compensatory damages to $250,000 unless the death constitutes a felonious killing, in which case the WDA's felonious killing exception permits unlimited recovery of compensatory damages. § 13–21–203(1)(a). We disagree with the Stamps' argument for the simple reason that the SSA's damages cap provision prevails over the WDA's damages cap provision in its entirety, including the felonious killing exception. The SSA itself mandates that its provisions prevail over any inconsistent provision of law or statute. § 33–44–114. In addition, general principles of statutory construction dictate that the more specific provisions of the SSA prevail over the general provisions of the WDA. *See* § 2–4–205, C.R.S. (2007) ("[T]he special or local provision prevails as an exception to the general provision, unless the general provision is the later adoption and the manifest intent is that the general provision controls.").

In sum, we construe the meaning of the term "injured" as it is used in the SSA's damages cap provision to include death, and interpret the phrase "any derivative claim by any other claimant" contained in the statute to include skiing-related wrongful death claims. Hence, we hold that the SSA's damages cap provision, and not the WDA's damages cap provision, limits the amount of compensatory damages that may be recovered from a ski area operator in a skiing-related wrongful death action to $250,000. We also hold that the WDA's felonious killing exception, which provides for unlimited compensatory damages, does not apply to skiing-related wrongful death actions.

### B. The Amended Complaint Alleging Exemplary Damages Should Have Been Granted

We next address the question of whether the trial court abused its discretion when it denied the Stamps' motion to amend their complaint to add a claim for exemplary damages. The Stamps argue that their motion to amend should have been granted because it was timely filed and established prima facie proof that Vail's conduct was willful and wanton. Our review of the discovery documents indicates that the trial court abused its discretion by not granting the Stamps' motion to amend their complaint.

### 1. Exemplary Damages in Skiing–Related Wrongful Death Actions Are Controlled by the WDA's Exemplary Damages Provision

██ Colorado's general exemplary damages statute is contained in section 13–21–102, C.R.S. (2007), and permits exemplary damages in civil actions in which the injury is attended by circumstances of "fraud, malice, or willful and wanton conduct." § 13–21–102(1)(a).[12] By its own terms, the procedural guidelines of the general exemplary damages statute do not apply to claims for exemplary damages in wrongful death actions. § 13–21–102(1.5)(b) ("The provisions of paragraph (a) of this subsection (1.5) shall not apply to any civil action or arbitration proceeding described in 13–21–203(3)(c) [of the WDA]."). Instead, claims for exemplary damages are controlled by the WDA's own exemplary

---

12. Exemplary, or punitive, damages are available in Colorado only by statute. *Kaitz v. Dist. Court*, 650 P.2d 553, 556 (Colo.1982).

damages provision, which is contained in section 13–21–203(3) of the WDA.

## 2. The SSA's Compensatory Damages Cap Does Not Apply to Exemplary Damages Awarded Under the WDA

Initially, we acknowledge that tension exists in construing the SSA's damages cap provision to allow claims for exemplary damages but to prohibit claims for felonious killing in skiing-related wrongful death actions that involve alleged aggravated conduct on the part of the defendant. This tension exists because the elements of a claim for felonious killing under the WDA's damages cap provision overlap with some but not all of the elements of a claim for exemplary damages under the WDA's exemplary damages provision.[13] To better understand this tension, we discuss compensatory and exemplary damages under the SSA in relation to exemplary damages under the WDA.

General tort law provides plaintiffs with two types of monetary remedies: compensatory damages and exemplary damages. *Kirk v. Denver Pub. Co.*, 818 P.2d 262, 265 (Colo.1991). Compensatory damages are intended to make the plaintiff whole. *Id.* The SSA implicitly provides for compensatory damages by making a violation of the SSA negligence per se under section 33–44–104(1), and by limiting such damages under section 33–44–113, the SSA's damages cap provision.

Exemplary damages are intended "to punish and penalize [a defendant] for certain wrongful and aggravated conduct and to serve as a warning to other possible offenders." *Beebe v. Pierce*, 185 Colo. 34, 37, 521 P.2d 1263, 1264 (1974). As discussed, the WDA expressly provides for exemplary damages and for their related procedures in section 13–21–203(3), the WDA's exemplary damages provision.

We have held that an injured skier can recover exemplary damages under the SSA.

*Pizza v. Wolf Creek Ski Dev. Corp.*, 711 P.2d 671, 684 (Colo.1985). In *Pizza*, we reasoned exemplary damages are permitted under the SSA because the SSA "manifests no legislative intent to abolish the applicability of section 13–21–102 [of the general exemplary damages statute] in civil actions arising out of skiing injuries." *Id. Pizza* involved the personal injury claims of an injured skier. *Id.* However, it appears to us that the holding logically and reasonably extends to the wrongful death claims of an injured skier's heirs.

Thus, we conclude that despite some existing tension and overlap between a claim for felonious killing, to which the SSA's damages cap provision applies, and a claim for exemplary damages, to which the SSA's damages cap provision does not apply, we are bound to follow the mandate of the legislature concerning exemplary damages in wrongful death actions and to give full force and effect to our case law precedent in *Pizza*. Therefore, we hold that the SSA's damages cap provision does not apply to exemplary damages awarded under the WDA's exemplary damages provision in skiing-related wrongful death actions.

### 3. Application

We turn now to the application of the WDA's exemplary damages provision in this case. The WDA's exemplary damages provision permits exemplary damages in wrongful death actions if the plaintiff proves "fraud, malice, or willful and wanton conduct":

> In all actions brought under 13–21–201 or 13–21–202 [of the Wrongful Death Act] in which ... the death complained of is attended by circumstances of fraud, malice, or willful and wanton conduct, the trier of fact, in addition to the actual damages, may award reasonable exemplary damages. The amount of such reasonable ex-

---

**13.** The elements of a claim for felonious killing and of a claim for exemplary damages under the WDA are similar but not coextensive. Whereas the felonious killing exception contained in the WDA's damages cap provision requires proof that the death constitutes first or second degree murder or manslaughter, the WDA's exemplary damages provision requires proof that the death was attended by circumstances of "fraud, malice, or willful and wanton conduct." *Compare* § 13–21–203(1)(a) (listing the elements of a claim for felonious killing) *with* § 13–21–203(3)(a) (listing the elements of a claim for exemplary damages).

emplary damages shall not exceed an amount that is equal to the amount of the actual damages awarded to the injured party.

§ 13–21–203(3)(a).

Claims for exemplary damages may not be included in an initial complaint, but must be made by amendment at least sixty days after the exchange of initial disclosures and must establish "prima facie proof of a triable issue" of exemplary damages:

> A claim for exemplary damages ... may not be included in any initial claim for relief. A claim for exemplary damages ... shall be allowed by amendment to the pleadings only after the passage of sixty days following the exchange of initial disclosures ... and the plaintiff establishes prima facie proof of a triable issue.

§ 33–21–203(3)(c)(I).

C.R.C.P. 15(a) permits a party to amend a pleading "only by leave of court or by written consent of the adverse party." The question of whether the plaintiff has established sufficient proof to add a claim for exemplary damages lies within the sound discretion of the trial court. *See Leidholt v. Dist. Court*, 619 P.2d 768, 771 (Colo.1980). A trial court may properly deny a motion to amend because of delay, bad faith, undue expense, or other demonstrable prejudice. *Benton v. Adams*, 56 P.3d 81, 84 (Colo.2002). Absent an abuse of discretion, a trial court's decision on a motion to amend will not be disturbed. *Id.* at 85.

Here, the trial court denied the Stamps' motion to amend without explanation. The WDA precluded the Stamps from moving to amend their complaint until discovery had supplied them with the requisite prima facie proof. The Stamps' motion to amend was made during discovery, shortly after Vail moved for summary judgment. At that time, the trial court had not set a trial date or a deadline to amend the pleadings. Consequently, there is no evidence of delay, bad faith, or other demonstrable prejudice.

Prima facie proof of a triable issue of exemplary damages is established by "a showing of a reasonable likelihood that the issue will ultimately be submitted to the jury for resolution." *Leidholt*, 619 P.2d at 771 n. 3. Such proof may be established through discovery, by evidentiary means, or by an offer of proof. *Id.* at 771. Prima facie evidence is evidence that, unless rebutted, is sufficient to establish a fact. *In re Piercen's Estate*, 118 Colo. 264, 266, 195 P.2d 725, 726 (1948); *see* Black's Law Dictionary 598 (8th ed.2004).

The Stamps' claim for exemplary damages is based upon Vail's alleged willful and wanton conduct. As defined by the WDA's exemplary damages provision, "willful and wanton conduct" means conduct that is "purposefully committed which the actor must have realized as dangerous, done heedlessly and recklessly, without regard to consequences, or of the rights and safety of others, particularly the plaintiff." *See* § 13–21–203(3)(b) (defining the term by reference to section 13–21–102(1)(b) of the general exemplary damages statute).

Conduct is willful and wanton if it is "a dangerous course of action" that is consciously chosen "with knowledge of facts, which to a reasonable mind creates a strong probability that injury to others will result." *Steeves v. Smiley*, 144 Colo. 5, 10, 354 P.2d 1011, 1014 (1960) (holding that evidence of a driver's decision to travel at a high speed and to pass other cars at night on a single-lane highway despite repeated warnings from his passengers that he was driving too fast was sufficient to present the question of willful and wanton conduct to the jury in a wrongful death action). For example, in *Rowan v. Vail Holdings, Inc.*, a federal district court held that the question of willful and wanton conduct should have been submitted to the jury where a ski area operator left an unprotected picnic deck at the bottom of a ski testing course despite several prior "close calls" with the deck, and required the deceased skier to sign a release of liability on the final day of testing. *Rowan v. Vail Holdings, Inc.*, 31 F.Supp.2d 889, 900 (D.Colo.1998).

In *People v. Hall*, this court held that there was probable cause that a skier committed the crime of reckless manslaughter where the skier was an experienced skier,

was skiing too fast for the conditions, and was skiing out of control, and where the injuries sustained by the other skier were like those of a person thrown from a moving car in an automobile accident. *People v. Hall,* 999 P.2d 207, 220–24 (Colo.2000).

Our review of the supporting discovery documents reveals issues of fact similar to the determinative facts which established a prima facie case in *Rowan* and probable cause in *Hall.* The pertinent factual issues presented in the discovery documents are: whether Chard was traveling in excess of twenty miles per hour as he approached the blind knoll; whether the snowmobile lifted off of the ground as it crested the blind knoll; whether Chard turned on the snowmobile's siren prior to the collision; and whether Chard saw and stopped for other skiers below another blind knoll. These issues are presented by party and witness depositions, expert affidavits, and police reports which were incorporated into the Stamps' motion to amend.

 Vail argues that these facts should be disregarded because they either require improper inference or are inadmissible lay testimony. Vail contends that it is impermissible to infer that Chard did not turn on the snowmobile's siren from witnesses' statements that they did not hear a snowmobile siren. However, inferences that are fairly deduced from other facts are reasonable. *See Venetucci v. Colorado Springs,* 99 Colo. 389, 393, 63 P.2d 462, 464 (Colo.1936).

 Vail also argues that witnesses' estimations of Chard's speed are inadmissible because the witnesses were not qualified as experts in predicting the speed of snowmobiles. However, lay witnesses of reasonable intelligence and ordinary experience may testify to the speed of a moving object without proof of further qualification. *Sherry v. Jones,* 133 Colo. 160, 163, 292 P.2d 746, 748 (1956); *see* C.R.E. 701.

We note that the WDA's exemplary damages provision requires the Stamps to establish prima facie proof of willful and wanton

conduct, not to prove willful and wanton conduct beyond a reasonable doubt, which is the burden of proof at trial.[14] This is a lenient standard. A plaintiff should have an opportunity to test the merits of any claim for relief that is supported by the underlying facts of the case. *Varner v. Dist. Court,* 618 P.2d 1388, 1390 (Colo.1980); *see* C.R.C.P. 15(a) ("[L]eave [to amend] shall be freely given when justice so requires.").

Our review of the discovery documents reveals issues of fact that establish prima facie proof of Vail's wanton and willful conduct, and thus prima facie proof of a triable issue of exemplary damages. This conclusion appears consistent with the trial court's findings when it denied Vail's motion for summary judgment, that whether Chard's speed was excessive and whether the snowmobile's siren was on are "triable issues of fact" that relate to the Stamps' claims of "negligence, recklessness, and wanton and willful conduct."

For these reasons, we hold that the trial court abused its discretion when it denied the Stamps' motion to amend their complaint to add a claim for exemplary damages.

## V. Conclusion

For these reasons, we discharge the rule to show cause as to the damages cap issue and make the rule absolute as to the Stamps' claim for exemplary damages.

Justice EID concurs in part and concurs in the judgment only in part.

**Justice EID, concurring in part and concurring in the judgment only in part.**

The majority holds that the Ski Safety Act ("SSA") limits the Stamps' recovery of compensatory damages in their wrongful death claim to $250,000. The majority reaches this result by reasoning that the SSA's legislative purpose requires the term "injury," as it is used by the SSA, to mean "injury *or death.*" Maj. op. at 442, 446. While I agree with the majority's result, I disagree with its reasoning. In my view, the wrongful death claim

14. *Compare* § 13–21–203(3)(c)(I) (requiring requiring prima facie proof of a triable issue to add a claim for exemplary damages) *with* § 13–25– 127, C.R.S. (2007) (requiring proof beyond a reasonable doubt to sustain an award of exemplary damages).

brought by the Stamps falls within the plain language of the SSA's compensatory damages cap because it is a "derivative claim brought by any claimant" that derives from an "injur[y]" to a "skier." § 33–44–113, C.R.S. (2007). Because the majority unnecessarily delves into the legislative purpose behind the SSA in order to stretch the term "injury" to include "death," I respectfully concur only in the judgment it reaches in Part IV.A.

## I.

The SSA's compensatory damages cap provides that:

> The total amount of damages which may be recovered from a ski area operator *by a skier ... who is injured ...* shall not exceed one million dollars, present value, *including any derivative claim by any other claimant,* which shall not exceed two hundred fifty thousand dollars, present value....

§ 33–44–113 (emphasis added). Thus, the cap applies to "any derivative claim by any other claimant" that derives from an "injur[y]" to a "skier." The Stamps argue that their wrongful death claim does not derive from a skier's injury but rather a skier's death, and that therefore this cap does not apply.

The majority agrees with the Stamps' argument regarding the nature of their wrongful death claim as deriving from a skier's death, and focuses its energies on how the term "injury" can be interpreted broadly enough to include "injury *or death.*" Maj. op. at 442–47. In my view, the majority's mistake is its acceptance of the Stamps' premise that their claim derives from a skier's death. Indeed, Colorado wrongful death law makes clear that a wrongful death claim is derived from the claim that the decedent could have brought had she survived her injuries.

The Wrongful Death Act ("WDA") provides that:

> When the *death of a person is caused by a wrongful act,* neglect, or default of another, *and the act,* neglect, or default *is such as would, if death had not ensued, have*

> *entitled the party injured to maintain an action and recover damages in respect thereof,* then, and in every such case, the person who or the corporation which would have been liable, if death had not ensued, shall be liable in an action for damages notwithstanding the death of the party injured.

§ 13–21–202, C.R.S. (2007) (emphasis added). Any wrongful death claim, then, contains two elements: (1) the death of a person, and (2) a wrongful act that would have entitled the person "injured" to maintain an action, had the person survived. We have described a wrongful death claim as a "derivative" claim because—as its second element demonstrates—it depends upon the claim that the decedent would have had if she had survived her injuries. *See, e.g., Steedle v. Sereff,* 167 P.3d 135, 140 (Colo.2007) ("[T]he right of heirs to collect damages in a wrongful death case ... is wholly derivative of the injury to the decedent."); *Pizza Hut of Am., Inc. v. Keefe,* 900 P.2d 97, 102 (Colo.1995) ("[A wrongful death claim] is derivative of and dependent upon the right of action which the decedent would have had, had she survived her injuries."). Consequently, a derivative claim, such as wrongful death, is "subject to the same defenses available to the underlying claims." *Elgin v. Bartlett,* 994 P.2d 411, 416 (Colo.1999); *see also Lee v. Colo. Dep't of Health,* 718 P.2d 221, 233 (Colo.1986) (holding that the comparative negligence of the decedent will reduce the recovery available in a wrongful death action brought by the decedent's heirs).

The derivative nature of a wrongful death claim therefore stems not from the decedent's death, although that is an element of the claim, but rather from the fact that it is dependent upon the claim the decedent would have had if she had survived her injuries. As applied to the facts of this case, the Stamps' wrongful death claim is derivative of, and dependent upon, any claim that Ashley would have had if she had survived her injuries. When viewed in this light, their claim falls within the statutory language of the SSA's compensatory damages cap because it is a "derivative claim brought by any claim-

ant" that derives from an "injur[y]" to a "skier."

It is important to note, however, that although a wrongful death claim is properly characterized as a derivative claim, it remains separate and distinct from any claim possessed by the decedent. As we held more than a half century ago, a wrongful death claim does not simply transfer the decedent's cause of action to the decedent's heirs; rather, it creates a statutory right of recovery that is separate and distinct from the cause of action that the decedent would have had if she had survived. *Fish v. Liley*, 120 Colo. 156, 162–63, 208 P.2d 930, 933 (1949). In particular, the damages elements of a wrongful death claim differ from those that would have been considered in the personal injury action that could have been brought by the decedent had she survived. *Id.* at 160, 208 P.2d at 932; *see also Colo. Comp. Ins. Auth. v. Jorgensen*, 992 P.2d 1156, 1164 n. 6 (Colo. 2000) ("[A derivative claim gives] rise to a separate and individual right to recover damages."); § 13–21–203, C.R.S. (2007) (limiting damages in wrongful death actions). In the ski-injury context, however, the SSA's compensatory damages cap has modified the damages calculation in a wrongful death action. *See* §§ 33–44–113 & –114, C.R.S. (2007) (limiting damages arising from ski-related injuries and providing that the SSA controls over any inconsistent laws or statutes). Because the Stamps' wrongful death claim is a "derivative claim by [a] . . . claimant" that derives from an "injur[y]" to a "skier," it falls within the language of section 33–44–113, and the SSA's compensatory damages cap applies.

## II.

Once it is established that a wrongful death claim derives from injury to the decedent, rather than his or her death, the statutory pieces of the puzzle under the SSA fall into place. For example, section 33–44–112 prohibits skiers from making any claim against a ski area operator "for *injury* resulting from any of the inherent dangers and risks of skiing" (emphasis added). If a skier dies as a result of the inherent dangers of skiing, a wrongful death claim brought by

the skier's heirs would fail because, had the skier survived and brought an injury claim herself, it would have failed.

Similarly, section 33–44–104 provides that any violation of the SSA constitutes negligence per se "to the extent such violation causes *injury* to any person" (emphasis added). In the case in which a violation of the SSA causes death, the wrongful death claim would be permitted to proceed on a negligence per se theory as well because the skier herself would have been permitted to proceed on that theory had she survived and brought an injury claim.

Finally, the Stamps have concentrated on the fact that section 33–44–110 shields ski area operators from liability "for *injury or death* to any [competitive skier] caused by course, venue, or area conditions that a visual inspection should have revealed or by collisions with other competitors" (emphasis added). They rely on this language for the proposition that the legislature intended to distinguish between injury and death, and therefore, the SSA's compensatory damages cap does not apply to wrongful death actions because it only contains the term "injury." Yet, as developed above, it would have made no sense for the legislature to use the terminology "injury or death" in the compensatory damages cap because wrongful death claims derive from injury, not death.

The fact that the legislature did use the phrase "injury or death" in one provision of the SSA does not change the operation of the WDA, and the WDA specifies that wrongful death claims derive from injury, not death. Therefore, all such claims—whether made in connection with death caused by competitive skiing, the inherent dangers of skiing, or negligence per se—should be analyzed in the same manner: The wrongful death claim depends upon (i.e., derives from) whether the skier would have had a successful claim if she had survived her injuries. Under section 33–44–110, if a skier was killed by a "course, venue, or area condition[ ] that a visual inspection should have revealed," then a wrongful death claim would fail, not because the provision prohibits liability for "injury *or death*," but rather because the ski area oper-

ator would not have been liable for the skier's injuries had she survived.

The Stamps have suffered a terrible loss. Yet it is for the legislature, not us, to decide whether to add a felonious killing exception to the SSA's damages cap. Because the current version of the cap does not contain such an exception, the Stamps' recovery of compensatory damages for their wrongful death claim is limited to $250,000.

### III.

I agree with the majority that the SSA's compensatory damages cap, section 33-44-113, applies to the Stamps' wrongful death claim. In my view, however, it is not necessary to stretch the term "injury," as used in that provision, to include "death." Instead, I believe that the Stamps' wrongful death claim derives from an "injur[y]" to a "skier" under the plain language of the cap. Accordingly, I respectfully concur only in the majority's judgment as to Part IV.A, and join the remainder of its opinion.